

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**



Signed November 15, 2007                    United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JAMES H. MOORE, | § | CASE NO. 06-31859-SGJ-7 |
|     DEBTOR. | § | |

| | | |
|---|---|---|
| | § | |
| THE CADLE COMPANY and | § | |
| JEFFREY H. MIMS, TRUSTEE, | § | |
|     PLAINTIFFS, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 06-3417 |
| | § | |
| BRUNSWICK HOMES, LLC; | § | |
| JHM PROPERTIES, INC.; | § | |
| JAMES H. MOORE, III; and | § | |
| ELIZABETH MOORE, | § | |
|     DEFENDANTS. | § | |

## MEMORANDUM OPINION AND ORDER DENYING BRUNSWICK HOMES, LLC'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Before this court is the motion for summary judgment [doc. no. 39] ("MSJ") of Brunswick Homes, LLC ("Brunswick") in the

1

above-referenced removed action (an action that was originally filed prepetition in state court) in which Jeffrey H. Mims ("Trustee") now stands in the shoes of creditor, The Cadle Company ("Cadle") (hereinafter, collectively, "Plaintiffs").  In the action, Plaintiffs are suing the various defendants, including Brunswick, on fraudulent transfer and constructive trust causes of action, and also seek the equitable remedy of reverse corporate veil piercing against JHM Properties, Inc. and Brunswick, under the theory that these entities are the alter egos of James H. Moore, III (the "Debtor" or "Mr. Moore")—the ultimate result of which theory would be to impose upon those entities the liabilities of Mr. Moore.  Brunswick seeks a summary judgment that:  (a) Plaintiffs' reverse corporate veil piercing remedy as to Brunswick fails as a matter of law, since (i) Moore is not a record equity interest holder of Brunswick, (ii) Brunswick has multiple (three) equity interest holders, and (iii) Brunswick was not in existence at the time Moore incurred indebtedness to Cadle; (b) Plaintiffs' constructive trust cause of action must fail as a matter of law, since there is no evidence of the three required elements to impose constructive trust; and (c) all of Plaintiffs' claims are barred by statute of limitations.  This court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (H) and (O).

2

Summary judgment is denied.  There are genuine issues of material fact in dispute (and there are relevant facts that cannot be ascertained from the summary judgment record) that bear on whether the Plaintiffs' causes of action and remedies are legally viable or not.  In denying summary judgment, the court notes that the reverse corporate veil piercing remedy is the most complex aspect of Brunswick's MSJ, because:  (a) Plaintiffs, indeed, propose a novel use of veil piercing, and (b) the application of it to Brunswick could have a harsh or even draconian effect on parties not before the court (*i.e.,* the equity owners of Brunswick not named in this action and possibly creditors of Brunswick not heretofore identified).  While the court has grave concern about the reverse corporate veil piercing proposed here, the court cannot hold that the theory is not viable as a matter of law, for the reasons explained below.

## II.  THE MATERIAL UNDISPUTED FACTS (AT LEAST BETWEEN PLAINTIFFS AND BRUNSWICK HOMES, LLC)[1]

### A.  Mr. and Mrs. Moore and the Partition of their Marital Property.

In the Texas real estate boom of the 1980s, Mr. Moore was an active participant in and around Dallas, Texas.  When the real estate market took an unfortunate downward turn in the late

---

[1] As there are other defendants in this litigation that are not involved with the Brunswick MSJ, the court makes no presumption that all of these facts are undisputed generally.

1980s, Mr. Moore incurred millions of dollars in debt, primarily in the form of guaranty liability relating to various real estate ventures in which he had been involved.  In the period from approximately November of 1988 to November 1990, Mr. Moore transferred community assets to his wife, Elizabeth Moore ("Mrs. Moore") via a post-marital partition agreement.  Mr. Moore has taken the position in his bankruptcy case that much of his and Mrs. Moore's marital property is Mrs. Moore's separate property (by virtue of the post-marital partition agreement).  Mrs. Moore has not filed bankruptcy along with Mr. Moore, so any separate property of hers (assuming that it is genuinely separate) is not property of the bankruptcy estate of Mr. Moore, pursuant to section 541 of the Bankruptcy Code.

### B.   JHM Properties, Inc.—Separate Property of Mrs. Moore or Not?

In 1991, Mrs. Moore created JHM Properties, Inc.  Mr. and Mrs. Moore assert that Mrs. Moore is the sole shareholder of JHM Properties, Inc. and that only Mrs. Moore's separate property—$100,000—has been invested into JHM Properties, Inc. Shortly after the formation of JHM Properties, Inc., also in 1991, Mr. Moore's own company, James H. Moore & Associates ("JHM Associates"), ceased operation and Mr. Moore entered into an employment agreement with JHM Properties, Inc.  JHM Properties, Inc., like JHM Associates, is and was in the real estate development business.

4

The Plaintiffs assert that Mrs. Moore is merely an interior designer, and is nothing more than a figurehead at JHM Properties, Inc., where Mr. Moore maintains complete control. The Plaintiffs assert that, by placing his wife in ownership of JHM Properties, Inc., Mr. Moore was able to shelter his assets from creditors. The Plaintiffs assert that Mr. Moore abused JHM Properties, Inc.'s corporate form in a variety of ways. The Plaintiffs point to Mr. Moore's signatory authority on JHM Properties, Inc.'s bank accounts; the cancellation of an employment agreement he had with JHM Properties, Inc. on the eve of his bankruptcy filing and then JHM Properties, Inc. rehiring him within a month of the bankruptcy filing; JHM Properties, Inc.'s payment of Mr. Moore's personal American Express Card bills; JHM Properties, Inc.'s payment of Mr. Moore's country club dues; and JHM Properties, Inc.'s payment of Mr. Moore's personal legal fees as evidence that JHM Properties, Inc. is really just a sham created to shield Mr. Moore's assets from his creditors.

### C. The Cadle Company's Judgments.

On November 5, 1992, the FDIC obtained a judgment in the amount of $1,077,602.60 against Mr. Moore (the "FDIC Judgment"). The FDIC Judgment was assigned to Republic Credit One ("Republic") on July 9, 1996. On July 30, 1998, Republic took Mr. Moore's deposition and discovered Mr. Moore's involvement with Brunswick (described below) and JHM Properties, Inc. Over

three years later, on September 17, 2001, Republic assigned the
FDIC Judgment to Cadle.  Then, Cadle, on November 25, 2003,
obtained a $6,723,843.32 default judgment against Mr. Moore in
its own right (the "Cadle Judgment"), relating to yet a different
obligation of Mr. Moore.

### D.   **Mr. Moore's Involvement with Brunswick.**

Meanwhile, in May of 1997, Brunswick was formed by Rod
Miller and Mr. Moore.  The owners of Brunswick were and are:
Enmark Parent Corp. (an affiliate of Rod Miller), a 49% equity
owner of Brunswick; Miller GP Corp. (another affiliate of Rod
Miller), a 1% equity owner of Brunswick; and JHM Properties, Inc.
(as described above, allegedly 100% owned by Mrs. Moore as her
separate property), a 50% equity owner of Brunswick.  Despite
this breakdown of ownership, Rod Miller had the right to vote
100% of the equity interests.  Mr. Moore put no money or other
assets into Brunswick at its formation, but was appointed
President of Brunswick.

In general terms, Rod Miller was the "money man" in
Brunswick and it was Mr. Moore's responsibility to generate
business.  At the time of Brunswick's formation, Enmark was
apparently providing accounting oversight of Brunswick.  However,
sometime in 1999, Enmark ceased its accounting oversight of
Brunswick and, during this time, it is alleged that Mr. Moore
started utilizing Brunswick for improper purposes.  The

Plaintiffs assert that Mr. Moore controlled and manipulated Brunswick for his own benefit in an effort to defraud his creditors.  Among the actions alleged in this regard were:  Mr. Moore's alleged embezzlement of over $1,000,000 in funds from Brunswick; Mr. Moore's status as the man who "ran the show" at Brunswick; Mr. Moore's alleged use of $850,000 of Brunswick funds to improve his house on Bent Tree Drive in Dallas; the use of Brunswick funds by Mr. Moore to pay for golf trips and a Cadillac Escalade; and the transfer of assets by Mr. Moore into Brunswick such as property located at 2700 Brookside in McKinney, Texas (the "Brookside Property"), property located at 5524 Emerson in Dallas (the "Emerson Property"), $129,000 in settlement proceeds from a Colorado lawsuit, and the assignment of a $500,000 promissory note relating to Horseshoe Nail Ranch from Mr. Moore to Brunswick.  The gist of the allegations seems to be that Mr. Moore used Brunswick (although it was legally thrice removed from him)[2] as his personal piggy bank—ergo Brunswick was his alter ego and its veil should be pierced so that Mr. Moore's creditors can look to the assets of Brunswick for payment of their claims.

### E.    Events Immediately Preceding Mr. Moore's Bankruptcy Filing.

On April 24, 2002, Rod Miller apparently caught on to Mr.

---

[2] Thrice removed, in that Mr. Moore's wife owned the stock of JHM Properties, Inc. as her separate property, and JHM Properties, Inc. was a 50% equity owner of Brunswick.

Moore's alleged self-dealing with Brunswick and demanded from Mr. Moore final accounting reports of Brunswick. The relationship between Rod Miller and Mr. Moore continued to deteriorate, resulting in Mr. Moore being fired as the president of Brunswick on December 5, 2005.

In January and March of 2005, Cadle, in connection with collection of its two judgments against Mr. Moore, deposed Rod Miller. It was during these depositions that Rod Miller, apparently for the first time, learned that it was *Mrs.* Moore—not *Mr.* Moore—who owned JHM Properties, Inc. On April 5, 2005, Cadle filed the above-referenced action in state court, which was later removed to become this adversary proceeding. As the action before the state court was progressing toward trial in early-to-mid-2006, three events occurred in relatively quick succession: On April 25, 2006, Mr. Moore's long-time employment contract with JHM Properties, Inc. was terminated; on May 2, 2006, Mr. Moore filed the instant Chapter 7 case; and on June 1, 2006, Mr. Moore entered into a new employment agreement with JHM Properties, Inc. and with Rubicon (another Elizabeth Moore entity). Most of the summary judgment evidence relied upon by Brunswick is in the form of deposition testimony.

### III. LEGAL ANALYSIS

#### A. Summary Judgment Standard

Summary judgment is appropriate if "the pleadings,

8

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A summary judgment motion is properly granted only when, viewing the evidence in the light most favorable to the nonmoving party, the record indicates that there is no genuine issue as to any material fact." *Am. Home Assurance Co. v. United Space Alliance, LLC,* 378 F.3d 482, 486 (5th Cir. 2004). The materiality of facts is governed by substantive law, and only facts that might affect the outcome of the suit will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In summary, the court must review the factual and legal issues presented in Brunswick's MSJ in the light most favorable to the Plaintiffs. This court may only grant summary judgment in favor of Brunswick if there is no genuine issue of material fact that would preclude summary adjudication for Brunswick. Otherwise, the court must deny summary judgment. This is a high hurdle to meet.

The most challenging issue posed in the MSJ, distilled to its essence, is whether Plaintiffs can avail themselves to the remedy of reverse corporate veil piercing with respect to Brunswick—so that Brunswick's assets may be looked to for payment of the obligations of Mr. Moore—when Mr. Moore was not and is not

a record equity interest owner of Brunswick.  If the remedy is not available as a matter of law in this context, then, of course, dismissal of the count of Plaintiffs' Complaint seeking this remedy is appropriate.  Thus, the court must examine: (1) whether there is such a remedy of "reverse corporate veil piercing" recognized under Texas law[3] and, if so, (2) whether it can be applied when the individual whose obligations are involved (Mr. Moore) was/is not even an equity owner of the business enterprise whose assets might be reached.

The court holds that, while the notion of reverse corporate veil piercing, frankly, has rather thin roots in Texas jurisprudence (if one peels back the onion—as this court has done below), and while it is a rather unusual concept that surely must be cautiously applied (to avoid trampling on due process rights of those not before the court), the theory has been recognized as a viable theory under Texas law by the Fifth Circuit.  *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 243 (5th Cir. 1990).  Moreover, *Zahra* instructs that while equity ownership is a traditional requirement to apply reverse corporate veil piercing, the remedy may be appropriate even where the individual

---

[3] As courts are required to apply the law of incorporation to corporate veil issues, the court will analyze Texas law in the case at bar.  *Jefferson Pilot Broadcasting Co. v. Hilary & Hogan, Inc.*, 617 F.2d 133, 135 (5th Cir. 1980).  The entities involved in this adversary proceeding (JHM Properties, Inc. and Brunswick) are a Texas corporation and limited liability company, respectively.

whose liability is involved (here, Mr. Moore) was not a record or nominal equity owner of the entity to be pierced—for example if the individual had/has a *de facto* ownership in the corporation.[4] Since Plaintiffs plead, essentially, that Mr. Moore has or had a *de facto* interest in Brunswick (albeit thrice removed, allegedly through his own contrivances), their count for reverse corporate veil piercing survives dismissal.  A trial on the merits is appropriate to determine whether Mr. Moore had a *de facto* interest in Brunswick and whether the standards for application of reverse corporate piercing can otherwise be established by Plaintiffs.

## B.    The Evolution and Efficacy of the Doctrine of "Reverse Corporate Veil Piercing."

The court starts by noting the general principle, long imbedded in our corporate laws, that a parent corporation (or shareholder) is not liable for the acts of its subsidiary. *United States v. Bestfoods*, 524 U.S. 51 (1998).  In fact, one of the principal objectives of the formation of corporations (or business entities such as limited liability companies) is to isolate liabilities among separate entities.  Thus, it is a basic

---

[4] In the case at bar, Brunswick is a Texas limited liability company ("LLC"), not a corporation, but the court discusses herein the body of case law dealing with "alter ego" and veil piercing in the context of corporations.  The court believes that whether a business enterprise is an LLC or a corporation is a distinction without a difference in this context.

11

proposition that corporate veils exist for a reason—to separate
and isolate—and should only be pierced reluctantly.  However,
exceptions have emerged in the common law.  Most notable is the
"alter ego doctrine."

**1.  Texas Supreme Court's Recognition of the Alter Ego
Doctrine and the "Traditional" Corporate Veil Piercing Remedy.**

In 1986, the Texas Supreme Court issued its now-famous
opinion in *Castleberry v. Branscum*, 721 S.W.2d 270 (Tex. 1986)
that articulated the "alter ego doctrine."  In that opinion, the
Texas Supreme Court held that the alter ego doctrine may be
applied to disregard a corporate entity (and hold a *shareholder*
liable for the debts of a *corporation*) when:  (1) there is such a
unity between a corporation and an individual that the
separateness of the corporation has ceased; and (2) holding only
the corporation liable would result in injustice.  The court
explained that the so-called alter ego doctrine (or a finding of
alter ego) is one basis out of seven for disregarding a corporate
fiction.  The court added that whether the alter ego doctrine
applies depends on the following factors:  the total dealings of
the corporation and the individual, including the degree to which
corporate formalities have been followed and corporate and
individual property have been kept separately; the amount of
financial interest, ownership and control the individual
maintains over the corporation; and whether the corporation has
been used for personal purposes.  *Id.* at 272.  Thus, *Castleberry*

12

was the Texas Supreme Court's rubber stamp on the legal viability
of the remedy of *traditional* corporate veil piercing (*i.e.,*
disregarding a corporate veil to hold a shareholder liable for
obligations of a corporation).

The Fifth Circuit later referred to *Castleberry* as
"puzzling" in the case of *Pan Eastern Exploration Co. v. Hufo*,
855 F.2d 1106, 1131 (5th Cir. 1988), with its "laundry list of
seven relatively detailed rationales that intertwine and overlap,
yet point in different directions."  The Fifth Circuit indicated
that it thought there were three distinct strands of corporate
disregard under Texas law: (1) alter ego proper—where a
corporation is operated as a mere tool or business conduit of
another; (2) illegal purpose—use of the corporation "as a
technique for avoiding legal limitations on natural persons or
corporations"; (3) sham to perpetrate a fraud.  *Id.* at 1131-33.[5]

_____

[5] In addition to application of the alter ego doctrine to
hold a shareholder liable for the debts of a corporation, the
doctrine has been applied to hold one corporation liable for
another corporation's debts.  In such situations, courts have
considered the following factors to determine whether an "alter
ego" situation exists and there should be disregard of corporate
separateness:

(1) identity of shareholder, directors, officer, or
employees between the corporations;
(2) failure to distinguish in ordinary business dealings
between the corporations;
(3) operating of one corporation is provided by the other;
(4) extent to which books and records have been kept;
(5) whether the two corporations have common business
departments;
(6) whether the two corporations have separate meetings of

13

  **2.  The Texas Legislature's Limitation on the Scope of *Castleberry*.**

  Notably, not long after *Castleberry*, the Texas Legislature reacted, and it reacted rather significantly.  It did so by amending Article 2.21 of the Texas Business Corporation Act (a statute entitled "Liability of Subscribers and Shareholders")[6]

---

shareholders and directors;
  (7) whether an officer or director of one corporation is permitted to determine the policies of the other;
  (8) whether the corporations file consolidated tax returns;
  (9) any other facts that suggest that one entity is the mere conduit of the other.

J. Maxwell Tucker, *Substantive Consolidation Under the Microscope*, 25TH ANNUAL BANKRUPTCY CONFERENCE, UNIVERSITY OF TEXAS SCHOOL OF LAW, pp 3-4 (Nov. 2006) (citing *Stewart & Stevenson v. Serv-Tech, Inc.,* 879 S.W.2d 89, 107(Tex. App.—Houston [1st Dist.] 1994, pet. denied); *Salazar v. Coastal Corp.,* 928 S.W.2d 162, 169-70 (Tex. App.—Houston [14th Dist.] 1996, no writ), *Lachalet Int'l Inc. v. Nowik,* 787 S.W.2d 101, 107(Tex. App.—Dallas 1990, no writ)).

  [6]Specifically, in 1989, the Texas Legislature significantly amended Article 2.21 of the Texas Business Corporation Act, with further amendments occurring in 1993 and 1997.  In 1989, the legislature added a provision in Art. 2.21(A) limiting alter ego liability (with respect to contractual debts of a corporation) to situations where there was an actual fraud perpetrated on the obligee for the direct benefit of the perpetrator.  1989 Tex. Sess. Law Serv., 71st Leg., Ch. 217, § 1 (West).  In 1993, the legislature added language to Art. 2.21(B) making the liability set forth in Art. 2.21(A) the exclusive liability, preempting any other alter ego liability under common law or otherwise.  1993 Tex. Sess. Law Serv., 73rd Leg., Ch. 215, § 2.05 (West).  In 1997, the legislature added "affiliates" of the corporation, of the shareholders, of the owners of beneficial interests in shares, and subscribers of shares to the list of parties to whom § 2.21(A) applies (which, as of 1993, already included shareholders, beneficial interest holders, and subscribers of shares).  1997 Tex. Sess. Law Serv., 75th Leg., Ch. 375, § 7 (West).  The Texas Legislature has, therefore, limited the availability of the alter ego doctrine (*i.e.*, in the context of traditional veil piercing, and with respect to contractual

which modified substantially the common law as it was developing
in Texas, with regard to traditional corporate veil
piercing—*i.e.,* in the context of making a *shareholder* liable for
a *corporation's* contractual debts.  Whereas the common law, as
articulated in *Castleberry*, was that a shareholder might be
liable for a corporation's debt if there was such a unity between
the corporation and an individual, so that the corporation had
ceased to be a separate entity, and if allowing the individual to
avoid liability through the use of the corporate form would work
an injustice, Article 2.21 changed this, so that a shareholder
(or an affiliate of the shareholder or of the corporation, for
that matter) now will not be liable for the corporation's
*contractual* debts under the theory that it is the "alter ego" of
the corporation (or on the basis of any actual or constructive
fraud or a sham to perpetrate a fraud, or other similar theory)
unless an obligee of the corporation demonstrates that the
shareholder/affiliate "caused the corporation to be used for the
purpose of perpetrating and did perpetrate an **actual fraud** on the
obligee primarily for **the direct personal benefit**" of the
shareholder/affiliate (emphasis added).  Thus, a plaintiff (*i.e.,*
creditor of a corporation) attempting to veil-pierce and impose a
corporation's contractual liability on a shareholder/affiliate
has to show both: (a) that the shareholder/affiliate used the

---

liabilities) three times since *Castleberry*, via Art. 2.21.

15

corporation to perpetrate an *actual fraud* on the creditor of the corporation (constructive fraud is insufficient); and (b) it was primarily for the *direct personal benefit* of the shareholder/affiliate. The statute makes rather clear that a simple failure to observe corporate formalities (with the specter of some injustice or inequity) is not enough to impose liability on the shareholders/affiliates of a corporation for the corporation's contractual obligations. The statute clearly preempts the common law that evolved prior to the statute. *See* subsection B ("The liability of a [shareholder/affiliate] for an obligation that is limited [by this statute] is exclusive and preempts any other liability imposed on a [shareholder/affiliate] for that obligation under common law or otherwise . . .").

In summary, under the common law prior to the amendments to Article 2.21 of the Texas Business Corporation Act, a certain finding of fact (alter ego/lack of separateness), coupled with equitable considerations (injustice/unfairness), would create grounds for disregarding a corporate veil. However, the Texas Legislature clearly aborted the course that the common law had taken, when the amendments to Article 2.21 were enacted—reflecting a desire of the legislature that there be a tougher standard of "actual fraud" for the "direct personal benefit" of the shareholder/affiliate in order to impose contractual corporate liabilities onto an individual

16

shareholder/affiliate.

### 3. Meanwhile, Enter the Fifth Circuit in Validating the Notion of Reverse Corporate Veil Piercing.

It appears that the Texas Supreme Court (and the Texas Legislature, for that matter) have never opined about what is really a very different concept: *reverse* corporate veil piercing.[7] However, the Fifth Circuit first acknowledged reverse veil piercing as a viable legal theory in Texas in 1990, in the *Zahra* case. *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 243 (5th Cir. 1990).

In *Zahra*, the Fifth Circuit first noted that the Texas Supreme Court had acknowledged in the case of *Castleberry* that *owners* of corporations who fail to maintain full legal formalities cannot expect to enjoy the limited liability that flows from the corporate form. In other words, *Castleberry* discussed that the traditional goal of veil piercing is to hold *individuals* liable for the debts of a *corporation*. The Fifth Circuit then discussed that the situation of reverse-veil-

---

[7]It appears to this court that Article 2.21 addresses upstream liability (liability of a shareholder of the corporation); sideways liability (liability of a sister of the corporation, as a sister would be an "affiliate"); and perhaps even downstream liability (liability of a subsidiary of a corporation, as a subsidiary would be an affiliate) with respect to contractual corporate debt. The problem is that Article 2.21 does not speak to holding a *corporation* liable for an *individual's* contractual debt. Thus, the Texas Legislature, it appears, has *not* addressed the type of reverse piercing being attempted in the case at bar.

piercing presents something unique and unusual—applying the traditional veil piercing doctrine in reverse, so that a *corporation's* assets are held accountable for the liabilities of *individuals* who treated the corporation as their alter ego.

The Fifth Circuit went on to cite the following rather scant authority for the proposition that reverse corporate veil piercing has been recognized in Texas jurisprudence and in other recognized authorities:  1 W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS, § 41.70, at 458-59 (1983 & Supp. 1989) (and the FLETCHER source cites a Florida intermediate appellate court opinion from 1987), as well as three Fort Worth Court of Appeals cases:  *American Petroleum Exchange, Inc. v. Lord*, 399 S.W.2d 213 (Tex. App.—Fort Worth 1966) (where the court allowed creditors to reach corporate assets to satisfy an individual debtor's liability where the individual debtor owned the great majority of the stock and treated the corporation as his alter ego);[8]

---

[8] The precise facts of *American Petroleum* are as follows: Plaintiff obtained a judgment against Sam Major for approximately $13,000 and began collection efforts including filing of an abstract of judgment and seizing property of Sam Major.  An appeal was taken.  Various procedural issues were raised in the appeal of the judgment.  One of them involved the propriety of American Petroleum Exchange, Inc. ("APE") having been named as a defendant in the litigation—the reason alleged was that Sam Major had transferred various property to APE and it was alleged that APE was the alter ego of Sam Major—specifically, they were "one and the same" and any property of APE should be subject to execution to satisfy the judgment of plaintiff against Major.  As to this issue, the Fort Worth appellate court noted that the evidence was that Major owned "*the great majority of the stock in the corporation, and as trustee for his daughter held nearly all*

*Dillingham v. Dillingham*, 434 S.W.2d 459 (Tex. App.—Fort Worth

1968) (a divorce case involving division of marital property

where assets and earnings of a corporation were treated as though

they were those of an individual spouse);[9] *Zisblatt v. Zisblatt*,

693 S.W.2d 944 (Tex. App. Ft. Worth 1985) (same).[10]  The Fifth

---

*the remainder.  There were very few shares in two or three
individuals.  At all material times, and up to the time of the
trial below, Major (as practically the sole owner) treated the
corporation as his alter ego.  The corporation did not exist
except as the shadow of his personality."*  The court held that
the record was sufficient to disregard the corporate fiction and
to declare the liability as to both Major and/or APE.  The court
opinion cites no authority except 14 Tex. Jur. 2d p. 128, et
seq., regarding "Corporations."  The term "reverse piercing" was
never used.

[9] The precise facts of this case are as follows:  the case
involved a property division award issued in a divorce action.
The husband had used his *wholly-owned corporation*, whose stock
was apparently his separate property, as his alter ego or
"instrumentality" to conduct business affairs.  Additionally,
there had been a commingling of the community property of the
marriage with the corporate property, such that any segregation
was "impractical or impossible."  Appellate court affirmed
divorce court's decision, holding that the increase in the
corporate property became part of the parties' community estate
and that wife should be awarded a portion of corporation's assets
as part of the divorce property settlement.  No authority was
cited and there was no analysis.  The term "reverse piercing" was
never used.

[10] The precise facts of *Zisblatt* are as follow:  the case
involved an appeal in a divorce case.  In cross petitions for
divorce, the wife filed a third party action against Dispo, a
corporation owned by the husband prior to and during marriage, to
seek a determination that it was the alter ego of husband and the
corporate assets should be considered community assets subject to
division.  Husband was a manufacturer's representative selling
products.  Dispo was basically a series of accounts into which
were deposited the majority of commissions earned by the husband
over the course of the marriage.  Dispo then paid a salary to the
husband.  Dispo held significant cash assets at the time of the

19

Circuit also acknowledged that the reverse piercing doctrine had
been applied in certain federal tax cases.

In summary, although the Fifth Circuit noted that there was
no Texas Supreme Court case at the time, and cited, frankly,
rather spotty authority for the proposition, it indicated and
accepted that Texas common law allows a creditor of an *individual*
to reach the assets of a *corporation* to pay its claim upon a
showing that there is an alter ego relationship between the
individual and the corporation.[11]  *Id.* at 244.  However, the
Fifth Circuit in *Zahra* (unlike the district court below it, whose
order the Fifth Circuit vacated) held that the individual must

---

divorce.  Dispo also bought the house the couple lived in, paid
the mortgage payments, and the couple paid Dispo rent.  Dispo
owned cars the couple drove.  The couple literally owned nothing
more than the clothes on their backs.  The corporation had
another nominal shareholder, the husband's sister, but the
evidence suggested this was a sham ownership—for which the sister
paid no consideration and the sister had no meaningful knowledge
about the business of the corporation.  The trial court denied
the third party action and appellate court concluded this was
reversable error.  This opinion contained a lengthy discussion of
alter ego (citing the traditional alter ego theories) and noted
that the concept had been applied in divorce actions.  The term
"reverse piercing" never was used.

[11]The Fifth Circuit further suggested that a finding of alter
ego would be appropriate "where a corporation is organized and
operated as a mere tool or business conduit" for another entity,
considering the following factors:  "the total dealings of the
corporation and the individual, including the degree to which
corporate formalities have been followed and corporate and
individual property have been kept separately, the amount of
financial interest, ownership and control the individual
maintains over the corporation, and whether the corporation has
been used for personal purposes."  *Id.* at 245.

have a *de facto* ownership interest in the corporation to be its
alter ego.  In *Zahra*, the individual appeared not to have a
direct ownership in the corporation involved but, rather, a
possible interest in a trust that, in turn, had an interest in
the corporation.  The Fifth Circuit remanded for the district
court to explore from the record whether the individual might
have had the equivalent of an ownership interest in the
corporation.

**4.  The Morphing of Reverse Corporate Veil Piercing
into a Remedy Frequently Acknowledged.**

It seems as though the remedy of reverse corporate veil
piercing has gained more credibility with time, picking up steam,
by virtue of its continued acknowledgment as a viable doctrine in
certain Fifth Circuit opinions (although never with much
analysis—as there has never been much need for analysis).  The
Fifth Circuit has acknowledged the doctrine on at least three
separate occasions since *Zahra*:  *Permian Petroleum Co. v.
Petroleos Mexicanos,* 934 F.2d 635, 644 (5th Cir. 1991) (court
once again discussed not just the alter ego doctrine and
*Castleberry*, but also its opinion in *Zahra* and reverse veil
piercing; while acknowledging that *Zahra* recognized reverse veil
piercing, the discussion is *dicta*, as the court ultimately
determined that the alter ego doctrine did not apply in this case
to permit veil piercing, and instead determined that the separate
doctrine of "sham to perpetrate a fraud" applied—which, citing

21

*Castleberry* at 273, the Fifth Circuit indicated is an equitable doctrine under Texas law "to prevent use of the corporate entity as a cloak for fraud or illegality or to work an injustice . . .")*; Schimmelpenninck v. Byrne*, 183 F.3d 347, 358 (5th Cir. 1999) (involved a creditor of a debtor bringing a reverse piercing action against a wholly-owned subsidiary of the debtor to recover his contractual claims against the assets of the subsidiary under alter ego theories; the Fifth Circuit's opinion revolves around standing, *i.e.,* who had the standing to pursue the action—the creditor individually or the curator of the debtor's estate; however, the Fifth Circuit did briefly address the notion of reverse piercing and once again stated that Texas jurisprudence has recognized the doctrine of reverse piercing for over thirty years, citing *Zahra* and the three Fort Worth appellate court cases cited in *Zahra*; the Circuit Court also refuted an argument that an unpublished *Southmark* opinion may have stood for the proposition that reverse piercing is not available to an entity, or the estate of an entity, that abused the corporate form for its own benefit)*; Bollore S.A. v. Import Warehouse, Inc.,* 448 F.3d 317, 325 (5th Cir. 2006) (the Fifth Circuit's most recent discussion of reverse piercing—it was really not much of a discussion of reverse piercing, as the holding deals with improper use of the Texas Turnover statute to adjudicate substantive rights; however, in a discussion that is arguably

22

*dicta*, the court acknowledged that the concept of reverse piercing exists under Texas common law, whereby creditors of an individual may reach a corporation's assets to satisfy the individual's liability to the creditors, when there is such a unity between corporation and individual that the separateness of the corporation has ceased and holding only the individual liable would result in injustice, citing *Zahra* and *American Petroleum*).

**5.   Troubling Aspects of the Reverse Corporate Veil Piercing Doctrine that Have Gone Unnoticed in this Jurisdiction, But Not in Other Circuits.**

The court recites this history of Texas and Fifth Circuit jurisprudence regarding reverse corporate veil piercing because this court is troubled that the doctrine has evolved and become accepted into the mainstream, starkly during a time when the Texas Legislature is limiting the availability of traditional veil piercing, and without meaningful discussion of what, in substance, the doctrine does (and can potentially do).  It is one thing to apply the reverse veil piercing doctrine in divorce property divisions, in the context of a small wholly-owned corporation (*e.g.,* so that a spouse might get a more equitable division of marital property—where significant value is in a corporation wholly-owned by the other spouse).  It seems quite another thing to broadly apply it in commercial litigation contexts (*e.g.,* so that a creditor who loaned money to an individual, with only the legitimate expectation of being able to

23

reach the individual's assets—including perhaps his stock in a corporation—is suddenly attempting to reach the *assets* of a corporation that might have its own significant creditors).[12] This court believes that reverse veil piercing—if generally applied without tight parameters—is a somewhat draconian remedy; it, without a doubt, essentially bypasses normal judgment-collection procedures that would permit a judgment creditor to attach the judgment debtor's *shares* in the corporation, but not the corporation's actual *assets*. *See Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1575-77 (10th Cir. 1990). The remedy arguably perverts established Bankruptcy Code priorities and state law creditor rights provisions, by putting creditors of an individual shareholder on a parity with creditors of the corporation (when logic suggests they should, at best, merely step into the shoes of the individual shareholder vis-a-vis the corporation—not share pari passu with the corporation's preexisting creditors). In the typical situation in which the doctrine has been used—situations involving a wholly-owned corporation or where there was apparently no nonculpable stakeholders or creditors of the corporation affected—it is not necessarily problematic. But this court fears that parties and

---

[12] Creditors who might have lent to the corporation only after undertaking due diligence as to what other creditors the corporation had, so that the creditor could assess risk and credit terms accordingly.

24

courts may be expanding their view of the availability of the reverse veil piercing remedy, without meaningfully considering all of the due process rights of the preexisting creditors of the corporation that may be affected.

   *Thus, in the absence of any Texas Supreme Court case clearly adopting reverse veil piercing, and in the absence of Texas or Fifth Circuit authority that clearly defines the specific parameters for its use*,[13] this court will incorporate for the case at bar the views expressed by certain courts from other circuits—namely, that reverse veil piercing should only be applied when it is clear that it will not prejudice non-culpable shareholders or other stakeholders (such as creditors) of a corporation.  *See Stoebner v. Lingenfelter*, 115 F.3d 576, 579-580 (8th Cir. 1997) (indicating that Minnesota has only recognized the doctrine of reverse corporate piercing in very limited circumstances—namely, when no shareholder or creditor would be adversely affected); *Scholes v. Lehmann*, 56 F.3d 750, 758 (7th Cir. 1995) (indicating without citations that "[r]everse piercing is ordinarily possible only in one-man corporations, since if there is more than one shareholder the seizing of corporation's

---

[13] The only parameter that the Fifth Circuit seems to have articulated so far for reverse veil piercing is that it interprets Texas law to limit it to situations in which the individual owns stock (at least de facto) in the corporation. *Permian Petroleum*, 934 F.2d at 643; *Zahra,* 910 F.2d at 245-46. *See also* n.11 herein for certain other general guidance suggested by the Fifth Circuit.

25

assets to pay a shareholder's debts would be wrong to the other shareholders.  Even in one-man corporations it is a rarity because a simple transfer of the indebted shareholder's stock to his creditors will usually give them all they could get from seizing the assets directly."); *Cascade Energy & Metals Corp. v. Banks*, 896 F.2d at 1575 (analyzing Utah law, suggesting that the reverse piercing doctrine was "little recognized" and presents many problems—namely it bypasses normal judgment collection procedures whereby a judgment creditor can simply attach the judgment-debtor's shares in the corporation and not the corporation's assets; ultimately refusing to apply the doctrine in the absence of a clear statement from the Utah Supreme Court adopting it).[14]

The approach herein suggested by this court (of only considering reverse veil piercing if the facts clearly show it will not prejudice nonculpable stakeholders) not only respects due process and established creditors rights principles, but also gives proper deference to the will of the Texas Legislature—*i.e.,* to impose a measured use of alter ego doctrine.

---

[14] The court also reiterates that the post-*Castleberry* limitations imposed by the Texas Legislature in Article 2.21 of the Texas Business Corporation Act (described earlier herein) appear not to be applicable in the case at bar, as that statute only addresses *traditional* veil piercing (*i.e.,* situations in which the liabilities of a *corporation* might be imposed upon a shareholder or affiliate.

**6. Application to the Facts at Bar: The Plaintiffs' Count for Reverse Veil Piercing Cannot be Dismissed as a Matter of Law.**

So where does this leave the court in the case at bar? First, this court is bound under *Zahra* and its progeny cited herein to rule that Texas recognizes the remedy of reverse corporate veil piercing. Second, this court also is bound by *Zahra* to conclude that while there must be an ownership interest between an individual and the corporation whose separateness is sought to be disregarded, it is possible that such ownership might exist indirectly or implicitly—such as where the actual record holder of the shares of the corporation holds them as a sham for the individual. Thus, summary judgment is denied in the case at bar since there is a material question of fact as to whether Mr. Moore is a *de facto* shareholder of JHM Properties, Inc. (is Mrs. Moore's separate property interest in JHM Properties, Inc. really her separate property or not?) and, assuming this hurdle is met, there is another material fact question whether JHM Properties, Inc. is the alter ego of Mr. Moore, so that Mr. Moore (not JHM Properties, Inc.) is the *de facto* equity interest owner of Brunswick. Third, assuming these factual hurdles can be met (to show *de facto* ownership by Mr. Moore), the court will also consider at trial the general standards suggested by the Fifth Circuit in *Zahra* for a finding of alter ego and application of reverse piercing: "where a

27

corporation is organized and operated as a mere tool or business conduit" for another, considering "the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Id.* at 245.  Finally, the court will consider at trial whether applying reverse veil piercing as to Brunswick would prejudice non-culpable shareholders or other stakeholders (such as creditors) of Brunswick.  Brunswick has argued that, since there are two other equity owners of Brunswick (other than JHM Properties, Inc.) Brunswick is entitled to summary judgment as a matter of law. But there is simply nothing in the law in Texas that *per se* prohibits reverse piercing when there are other equity owners. The court views this argument to raise a fact question—that question being whether the other shareholders or other stakeholders (such as creditors) of Brunswick would be prejudiced or harmed by the imposition of reverse corporate veil piercing as to Brunswick.  While logic may suggest that they surely would be, evidence, not logic, is necessary on this point.

### C.  Constructive Trust

The court will address briefly the less difficult question

28

of whether summary judgment is appropriate on the constructive fraud count.

The elements of constructive trust under Texas law are: (1) breach of a fiduciary relationship or, in the alternative, actual fraud, (2) unjust enrichment of the wrongdoer, and (3) tracing of the property to an identifiable res. *In re Southmark Corp.*, 49 F.3d 1111, 1118 n. 31 (5th Cir. 1995). Constructive trust is an equitable remedy to prevent unjust enrichment resulting from an unconscionable act. *Id.* at 1118. There must be proof of actual or constructive fraud. *Id*.

Brunswick's arguments in support of summary judgment concerning constructive trust are fairly simple. First, Brunswick argues that there is no fiduciary relationship between Brunswick and Cadle/Plaintiffs. Plaintiffs provide no real counter argument to this assertion. However, this is not fatal to Plaintiffs, since it is possible to establish a constructive trust without there being a fiduciary relationship (*i.e.,* if there was a fraud). Brunswick asserts that it is impossible for Brunswick to have defrauded Cadle because Brunswick was created five years after the judgment which Cadle seeks to collect and the Plaintiffs have provided no evidence that Brunswick did anything to defraud Mr. Moore's creditors. The court finds this argument somewhat nonsensical because it would seem to imply that a person could simply, the day after a judgment is entered

against him, create a corporate entity into which he dumps all of his corporate assets and, because the corporate entity was created after the judgment was entered, the creditors could do nothing about it. The question of a fraud is obviously intensely factual and the court cannot say as a matter of law that Plaintiffs cannot establish it.

Additionally, Brunswick asserts that there is no identifiable res upon which to impress a constructive trust. With regard to this and all of Brunswick's arguments refuting constructive trust, it misses an essential fact. *If* the Plaintiffs can show the court at trial that Brunswick is the alter ego of Mr. Moore (and otherwise meet the elements to be entitled to reverse piercing), then the Plaintiffs will have the footing to argue that Brunswick's assets are Mr. Moore's assets and should be impressed with a constructive trust. As this court sees it, the constructive trust remedy rests, at least in part, upon the reverse alter-ego remedy.[15] Because there remains a genuine issue of material fact as to whether Brunswick is Mr. Moore's alter ego, there also remains a genuine issue of material

---

[15] The court does not suggest that if the Plaintiffs win on their alter ego theory that they would *automatically* win on a constructive trust theory, only that the court believes that the constructive trust remedy would only be available to the Plaintiffs if the Plaintiffs prove that Brunswick is the alter ego of Mr. Moore. The Plaintiffs would still, then, have to show that the elements of constructive trust are present in order to win on their constructive trust theory.

fact as to whether Brunswick's assets should be impressed with a constructive trust in favor of Mr. Moore's creditors.

Finally, Brunswick asserts that Brunswick was not unjustly enriched by Mr. Moore's self-dealing (in fact, Brunswick asserts that it was depleted by Mr. Moore's actions), such that imposition of a constructive trust in favor of Mr. Moore's creditors on Brunswick's assets is not appropriate. The Plaintiffs counter that Mr. Moore transferred the following assets to Brunswick without any consideration, unjustly enriching himself and Brunswick: the Emerson Property, the Brookside Property, $129,000 in settlement proceeds from Colorado lawsuit, and the $500,000 promissory note. The Plaintiffs assert that these issues raise at least a material fact as to whether there was unjust enrichment so summary judgment must be denied. But Brunswick further asserts that Moore acquired the Emerson Property, the Brookside Property, and the Promissory note as nominee or agent for Brunswick such that nothing of value was transferred from Moore to Brunswick. This back and forth is an apt demonstration of a "genuine issue of material fact."

The court believes that the issue of whether or not Mr. Moore transferred assets to Brunswick could be quite important, should the Plaintiffs be able to show that Brunswick is the alter ego of Mr. Moore. The question of these alleged transfers from Mr. Moore to Brunswick also involves issues of material fact,

31

including what sort of interest Mr. Moore and Brunswick had in the Emerson Property, Brookside Property, and the promissory note; whether Brunswick was entitled to the Colorado lawsuit proceeds; and the facts surrounding the assignment of the $500,000 promissory note to Brunswick. Accordingly, the court must deny summary judgment on the question of constructive trust because genuine issues of material fact exist regarding these transfers.

### D.   Statute of Limitations

Finally, the court will dispose of Brunswick's statute of limitations argument. Brunswick asserts that the statutes of limitation applicable to the underlying causes of action/remedies should bar the Trustee (standing in the shoes of Cadle) from recovery. The statute of limitation on both fraudulent transfers and common law fraud in Texas is four years. Tex. Bus. & Comm. Code § 24.010(a)(1) (fraudulent transfers limitation period) and § 16.004 (common law fraud limitation period). However, the court believes that the limitations period for Cadle to enforce its judgment—and, therefore, for the Trustee to pursue these causes of action standing in Cadle's shoes—is longer than Brunswick suggests.

The most instructive case on this matter comes from the Texas Supreme Court: *Matthews Const. Co., Inc. v. Rosen*, 796 S.W.2d 692 (Tex. 1990). In *Matthews Construction*, the plaintiff

32

was awarded a judgment against a company in 1982 and then filed a
subsequent lawsuit in 1984 attempting to collect from the sole
shareholder of a company on an alter ego theory. *See id.*  In
discussing whether or not the statute of limitations for the
underlying cause of action should prevent the plaintiff from
pursuing the alter ego claim, the Texas Supreme Court observed
that the purpose of a statute of limitations is to "compel the
asserting of a cause of action within a reasonable time so that
the opposing party has a fair opportunity to defend while
witnesses are available," and that the plaintiff's claim in
pursuit of collection of his judgment was "not stale because
[plaintiff had] already pursued to the claim to judgment." *Id.*
at 694.  Further, the court found that applying the statute of
limitations for the underlying cause of action under such
circumstances, "would fail to serve the underlying purpose of
limitations and instead be a purely formal exercise." *Id.*  "[I]f
we were to apply limitations under these circumstances, it would
effectively permit the corporate form to be used as 'a cloak for
fraud,'" and the court would "not permit the law to be used for
unlawful ends." *Id.*

     The ultimate holding of the *Matthews Construction* case is
narrow because it states only that "once [plaintiff] filed suit
against [the company], limitations was tolled as to [the
company's] alter ego until final judgment." *Id.*  The opinion

does not state whether the applicable statute of limitations would be four years for the underlying cause of action or ten years for a suit to enforce judgment. But the Texas Supreme Court does appear to hint that "the limitations period for . . . an alter ego suit would be the same as for a suit to enforce judgment." Id. at 694 n. 3. The statute of limitations for enforcing a judgment in Texas is ten years. Tex. Civ. Prac. & Rem Code § 34.001.

The court believes that it is this ten year statute of limitations that applies to the Plaintiffs' pursuit of Brunswick as the alter ego of Mr. Moore in order to collect Cadle's judgment. This cause of action was filed on April 5, 2005 in state court, well with the ten year statute of limitations for collection on at least the November 2003 Cadle Judgment (if not the original 1992 FDIC Judgment later assigned to Cadle). Accordingly, the court will deny summary judgment as to Brunswick's statute of limitations defense.

### IV.  CONCLUSION AND ORDER

Based upon the foregoing, summary judgment to Brunswick is denied.

**IT IS SO ORDERED.**

### END OF MEMORANDUM OF OPINION AND ORDER ###

34