

US BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



The following constitutes the ruling of the court and has the force and effect therein described.

_____
**United States Bankruptcy Judge**

**Signed April 23, 2012**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JAMES H. MOORE, | § | CASE NO. 06-31859-SGJ-7 |
|     DEBTOR. | § | |

| | | |
|---|---|---|
| | § | |
| THE CADLE COMPANY, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 06-3417-SGJ |
| | § | |
| BRUNSWICK HOMES, LLC; | § | |
| JHM PROPERTIES, INC.; | § | |
| JAMES H. MOORE, III; and | § | |
| ELIZABETH MOORE, | § | |
|     DEFENDANTS. | § | |

### MEMORANDUM OPINION AND ORDER GRANTING
### DEFENDANTS' MOTION TO DISMISS ADVERSARY PROCEEDING
### FOR ABUSE OF JUDICIAL PROCESS

### I.  INTRODUCTION

During three days in mid-2011 (August 11, 2011; September 27, 2011; October 11, 2011) the bankruptcy court held an

1

evidentiary hearing on a somewhat extraordinary request by the
Defendants in the above-referenced adversary proceeding (the
"Adversary Proceeding" or the "Veil-Piercing Action"):  a request
that the bankruptcy court **dismiss the entire Adversary**
**Proceeding**, as a death-penalty sanction, because of certain acts
committed by the current Plaintiff, The Cadle Company ("Creditor-
Cadle"), and its counsel, which acts were argued to have been **an**
**abuse of judicial process**.  *See* Defendants' Joint Motion to
Dismiss Adversary Proceeding for Abuse of Judicial Process, for
Payment of Fees and Expenses and Brief in Support (the "Motion to
Dismiss") [DE # 168].[1]  In addition to the Motion to Dismiss,
certain supplements relating thereto (the "Supplements") [DE ##
205; 207; 220] were filed by one of the Defendants, Brunswick
Homes, LLC.  The Supplements urged, in the alternative, that the
bankruptcy court consider vacating an order it entered on April
11, 2011, pursuant to Fed. Rule of Civ. Pro. 60—specifically, an
Order Approving Trustee's Sale of Certain Claims ("Sale Order")—
which Sale Order approved the Chapter 7 Bankruptcy Trustee's sale
to Creditor-Cadle of the very claims and causes of action that
are being pursued in the Adversary Proceeding (again, as a
possible sanction for the Creditor-Cadle's alleged abuse of
judicial process).  Finally, the court was also presented, at the

---

[1] "DE # _" as used herein refers to the Docket Entry number at
which a pleading is filed in the docket maintained by the Bankruptcy
Clerk in Adversary Proceeding No. 06-3417.

above-mentioned three-day hearing, with a motion by Creditor-Cadle challenging the bankruptcy court's Constitutional authority to finally adjudicate the Adversary Proceeding, in light of *Stern v. Marshall*, 131 S. Ct. 2594 (2011)—suggesting that a remand of the entire Adversary Proceeding to state court was warranted.[2] *See* Motion of The Cadle Company for Judicial Determination of Whether the Bankruptcy Court has Constitutional Authority as a Non Article III Court to Adjudicate and Enter Final Judgment in the Adversary Proceeding in Light of the *Stern v. Marshall* Decision (the "*Stern* Motion") [DE # 188].

After hearing five witnesses and reviewing various documentary evidence, the court orally ruled on October 11, 2011 that the Motion to Dismiss would be granted, with prejudice, as a sanction for the conduct of Creditor-Cadle and its attorneys. ***What was the conduct?*** Most significantly, Creditor-Cadle (unbeknownst, during relevant times, to the court, the bankruptcy trustee, the Chapter 7 Debtor, and the general creditor body) was paying its long-term attorneys' legal fees (approximately $92,000) [Ex. P-9, p. 23 (line 10-25)], which legal fees were being incurred by such counsel ***for representing the Chapter 7 Trustee, as Trustee's special counsel,*** in matters that were, much of the time, directly ***adverse to Creditor-Cadle***. In other words,

---

[2]    The Adversary Proceeding was first removed from state court to this bankruptcy court on July 5, 2006.

Creditor-Cadle was paying both sides' lawyers' fees in litigation in which it was a party.  To be clear, while the Chapter 7 bankruptcy trustee was directly adverse to Creditor-Cadle in three rounds of litigation (at the bankruptcy court, district court, and court of appeals), ***the lawyer for the Chapter 7 bankruptcy trustee was being paid handsomely by his adversarial opponent (Creditor-Cadle)***, ***during a large portion of the litigation***.[3]  The disclosures filed with the bankruptcy court by the trustee's lawyer, pursuant to Bankruptcy Code sections 327 and 328 and Bankruptcy Rule 2014, failed to disclose that Creditor-Cadle would be paying the lawyer ***anything***.  As will be later further explained, it appears that the Chapter 7 trustee's lawyer also breached his duty to maintain client confidential information (by sending confidential information to his other client, Creditor-Cadle)[4] and also failed to follow instructions given to him by the Chapter 7 trustee.[5]

---

[3] Creditor-Cadle ultimately prevailed against the Chapter 7 bankruptcy trustee in "round 3" of their three rounds of litigation (*i.e.,* at the Fifth Circuit Court of Appeals).

[4] *See* Rule 1.05, Texas Disciplinary Rules of Professional Conduct. Specifically, unbeknownst to the trustee, his special counsel was sending billing invoices to Creditor-Cadle for many months, but not to the Chapter 7 trustee.  These invoices contained narrative descriptions of the services that were being provided to the trustee by his special counsel, and, in some instances, it appears that privileged strategy and communications were revealed.

[5] The chapter 7 trustee learned, many months after the fact, that Creditor-Cadle was paying the fees of the chapter 7 trustee's special counsel, became "shocked," and demanded that this be disclosed to the

4

A "death penalty," as a sanction in a civil lawsuit, is certainly not to be issued lightly.  However, the court finds that the various nondisclosures, conflicts of interest, and breaches of duty attributable to the Creditor-Cadle and its counsel (at both the bankruptcy court level and throughout much of a multi-month appeal) were so serious, so improper, and so demonstrative of callous indifference to applicable duties and ethical standards, that the entire Adversary Proceeding has been tainted and the very temple of justice has been defiled.  Thus, the "death penalty" (*i.e.,* dismissal with prejudice) in this Adversary Proceeding is entirely fitting.  The court also orally ruled on October 11, 2011 that the Supplements (seeking vacatur of the Sale Order) would be denied.  Finally, the court ruled on October 11, 2011 that the *Stern* Motion would be denied—to the extent Creditor-Cadle was arguing that the bankruptcy court lacks Constitutional authority to dispose of the Adversary Proceeding.  All other relief sought by any party is denied.

This is the court's written findings of fact and conclusions of law with regard to the procedural matters referenced above.  *See* Fed. R. Bankr. P. 7052(a)(1) and 9014(c).  Where appropriate, any finding that should be regarded as a conclusion shall be regarded as such, and *vice versa*.  The court reserves the right

---

bankruptcy court, but the chapter 7 trustee's special counsel never followed his client's instructions and never disclosed it.  Transcript of 8/11/11 Hearing [DE # 203], at pp. 30 (line 22) - 31 (line 25).

to supplement or amend these findings and conclusions.

## II.  FINDINGS OF FACT

### A. Jurisdiction.

1.   Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding, pursuant to 28 U.S.C. § 1334(b).  This bankruptcy court has authority to exercise such subject matter jurisdiction, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984.

2.   Predominantly statutory "core" matters are involved in this Adversary Proceeding, pursuant to 28 U.S.C. § 157(b)(2) (A), (E), (H), and possibly (K) and (O).  The Adversary Proceeding involves alleged fraudulent conveyances, constructive trust, and alter ego/reverse veil piercing.  The four defendants in the Adversary Proceeding are the Chapter 7 Debtor, his spouse, his spouse's wholly-owned corporation, and another corporation (the later of which filed a proof of claim in the bankruptcy case). While state law issues are certainly implicated, the Bankruptcy Code is also implicated by virtue of sections 541, 542, 544, 548, and 550 of the Bankruptcy Code (thus, to some extent, the claims in the Adversary Proceeding arise under the Bankruptcy Code).[6]

---

[6]  Among other things, the Bankruptcy Code's strong arm powers (11 U.S.C. § 544) are involved.

6

28 U.S.C. § 1334(b). Moreover, 28 U.S.C. § 157(b)(2)(E) and (H) dictate that a significant portion of the Adversary Proceeding should be regarded as "core" in nature.[7] This court declines to hold that 28 U.S.C. § 157(b)(2)(E) and (H) are unconstitutional. Thus, this court finds that it has authority to enter final orders in this Adversary Proceeding, pursuant to 28 U.S.C. § 157(b).[8]

3. Additionally, the court finds that the discrete contested matters before the court—particularly those embodied in the Motion to Dismiss—are core proceedings. The Defendants are seeking dismissal of the Adversary Proceeding as a sanction by the court for alleged abuse of judicial process. The Fifth Circuit Court of Appeals, in the case of *Citizens Bank & Trust*

---

[7] *See Kirschner v. Agognia (In re Refco Inc.)*, 461 B.R. 181, 184-194 (Bankr. S.D.N.Y. 2011) (Judge R. Drain) (bankruptcy court held that it had jurisdiction over strong arm fraudulent transfer claims in an action that also included unjust enrichment theories, noting that bankruptcy court's final judgment could be treated as a **proposed** order by a higher court, if necessary in light of *Stern v. Marshall*); *Zazzali v. Swenson (In re DBSI, Inc.)*, Adv. Pro. 10-54648, 2012 WL 112640, at *1 (Bankr. D. Del. Jan. 13, 2012) (Judge P. Walsh) (ruling that actual and constructive fraudulent transfer claims, asserted under both state law and section 548, and a claim of unjust enrichment, the latter of which was essentially an alternative theory to assert fraudulent transfers, were all "core" proceedings).

[8] In the event that a higher court ultimately disagrees that this Adversary Proceeding involves "core" matters and/or otherwise determines that the bankruptcy court lacked Constitutional authority to enter a final order in this Adversary Proceeding, the bankruptcy court **recommends** that this Memorandum Opinion and Order be regarded as the bankruptcy court's **proposed** findings of fact and conclusions of law and order, and further **recommends** that the District Court enter it as its own, after due consideration, in accordance with 28 U.S.C. § 157(c)(1).

*Co. v. Case (In re Case)*, 937 F.2d 1014, 1023 (5th Cir. 1991), held that bankruptcy courts, as Article I as opposed to Article III courts, have the inherent power to sanction and police their dockets with respect to misconduct.

**B. Procedural History and Factual Background.**

4.  This Adversary Proceeding has a very long history at this juncture.  It was first commenced as a state court action on April 5, 2005, in the 134th Judicial District Court of Dallas County, Texas by the Creditor-Cadle.

5.  Creditor-Cadle is an Ohio company that generally seems sophisticated and, as part of its ordinary business, purchases from financial institutions multimillion dollar judgments and claims against debtors (or at least acts as the collection agent with regard thereto).[9]

6.  Relevant to this Adversary Proceeding, Creditor-Cadle purchased certain large claims and judgments (one dating back to 1992) against James H. Moore, III, who would later become a

---

[9]  *Compare* Transcript from 4/15/08 [Ex. P8], p. 92 (lines 19-20) (Jeanne Isler, an employee with Creditor-Cadle, testified that the business of Creditor-Cadle is "They purchase loans from the banks and financial institutions") *to* Transcript from 9/27/11 [DE # 224], p. 7 (line 5) (Jeanne Isler testified that the business of Creditor-Cadle is "To collect on performing and nonperforming loans").  In any event, Creditor-Cadle has represented itself in pleadings and proofs of claim to be the assignee of indebtedness owed by the Debtor-Moore (*i.e.,* the actual creditor/holder of the debt) and has itself obtained state court judgments against the Debtor-Moore.

Chapter 7 Debtor (the "Debtor-Moore").[10]

    7.   The law firm of Bell Nunnally & Martin LLP ("BNM"), and attorney Jeff Lowenstein ("Attorney JL"), in particular, represented the Creditor-Cadle in pursuing collection efforts, prepetition, against the Debtor-Moore. This included representation of Creditor-Cadle in this Veil-Piercing Action. The Veil-Piercing Action involves claims against the Debtor-Moore and various other defendants that are (or were) closely connected to the Debtor-Moore (*i.e.,* his wife, Brunswick Homes, LLC, and JHM Properties, Inc.). As earlier mentioned, the claims in the Veil-Piercing Action are in the nature of fraudulent transfer and constructive trust, in addition to a request for the equitable remedy of reverse corporate veil piercing against JHM Properties, Inc. and Brunswick Homes, LLC (under the theory that these entities were the alter egos of Debtor-Moore, the ultimate result of which theory would, presumably, be to impose upon those entities the liabilities of the Debtor-Moore).

    8.   Approximately 13 months after the Creditor-Cadle filed

---

[10] The record developed at earlier hearings in this Adversary Proceeding revealed that, on November 5, 1992, the FDIC obtained a judgment in the amount of $1,077,602.60 against the Debtor-Moore (the "FDIC Judgment"). The FDIC Judgment was assigned to Republic Credit One ("Republic") on July 9, 1996. On September 17, 2001, Republic assigned the FDIC Judgment to the Creditor-Cadle. Then, the Creditor-Cadle, on November 25, 2003, obtained a $6,723,843.32 default judgment against the Debtor-Moore in its own right (the "Cadle Judgment"), relating to yet a different obligation of the Debtor-Moore. *See* DE # 109, *Memorandum Opinion and Order Denying Brunswick Homes, LLC's Motion for Summary Judgment.*

this Veil-Piercing Action, on May 2, 2006, the Debtor-Moore filed a chapter 7 bankruptcy case.

9. On July 5, 2006, the Veil-Piercing Action was removed to the bankruptcy court by the Creditor-Cadle, with the representation that "core" matters were involved pursuant to 28 U.S.C. § 157(b)(2)(A), (K), and (O). *See* Notice of Removal, DE # 1. One of the Defendants, Brunswick Homes, LLC, filed a Joinder in the removal asserting that the removal was proper. DE # 6. No party argued that removal was improper.

10. On July 27, 2006, the bankruptcy court held its first status conference in the Adversary Proceeding and attorney Bruce Akerly ("Attorney BA"), then with BNM, appeared for the Creditor-Cadle. Attorney BA acknowledged that the various claims and causes of action asserted in the Veil-Piercing Action belonged to (or were assertable by) the Chapter 7 Trustee—in light of the Debtor-Moore having filed bankruptcy. Thereafter, the Creditor-Cadle was voluntarily dismissed out as the party-plaintiff in the Veil-Piercing Action and the Chapter 7 Trustee, Jeffrey Mims (hereinafter the "Chapter 7 Trustee") was substituted in as the correct party with standing (in December 2006). DE ## 19 & 20.

**C. The Chapter 7 Trustee Seeks to Employ, as Special Litigation Counsel, Creditor-Cadle's Counsel on a Contingency Basis in the Veil-Piercing Action.**

11. Meanwhile (on August 15, 2006), the Chapter 7 Trustee, recognizing that he would need counsel, as the substituted-

10

plaintiff in the Adversary Proceeding, entered into an engagement letter agreement with BNM (the "Engagement Letter"), whereby it was agreed that BNM would be employed to act as Special Counsel to the Chapter 7 Trustee in the Veil-Piercing Action, subject to court approval. Ex. D1. Engaging BNM seemed to make logical sense to the Chapter 7 Trustee, since: (a) the BNM lawyers had familiarity with the Veil-Piercing Action, having represented Creditor-Cadle while it had been the plaintiff in the action; and (b) the Chapter 7 Trustee faced obstacles finding any other counsel, since there was no money in the bankruptcy estate to pay lawyers. The Engagement Letter indicated that BNM agreed to represent the Chapter 7 on a contingency basis. The Engagement Letter, which was signed by both Attorney BA and the Chapter 7 Trustee, stated that it was anticipated that Attorney BA and Attorney JL (both lawyers with 20+ years of experience) would work on the matter. The Engagement Letter, in addressing the topic of compensation, stated that a "request for the allowance and payment of any fees and expenses to BN&M, to be paid as an administrative expense claim, will be submitted for approval by the Bankruptcy Court at the conclusion of the [Veil-Piercing] Action and upon recovery of money in connection with the [Veil-Piercing] Action on behalf of the estate."[11] There was also an

---

[11] As previously mentioned, there were no (or negligible) funds in the bankruptcy estate at the time of BNM's retention.

11

acknowledgment in the Engagement Letter that BNM had **_previously_** incurred fees and expenses in the Veil-Piercing Action while representing the Creditor-Cadle in state court and that these would **_not_** be included in any fee application, but the Creditor-Cadle would be permitted to file a proof of claim or even seek payment as an administrative claim for these **_prepetition_** fees and expenses.  The Engagement Letter went on to state that BNM understood "that it represents and owes fiduciary duties only to the Trustee in the Action and not the Cadle Company."  Ex. D1.

12.  On August 22, 2006, an application for the Chapter 7 Trustee to employ BNM as special counsel was filed and served in the Debtor-Moore's bankruptcy case ("Special Employment Application").  Ex. D2.  The court notes, anecdotally, that the Special Employment Application was not actually signed by the client (*i.e.,* the Chapter 7 Trustee), as is more appropriate and customary with any bankruptcy employment application, but, rather only by Attorney BA.  However, the Engagement Letter was attached as an exhibit thereto and the letter, at least, included the Chapter 7 Trustee's signature.  In any event, the Special Employment Application set forth the contingency-fee compensation arrangement that apparently had been negotiated with the Chapter 7 Trustee, stating that "**_Compensation to BNM, if any, will be paid only upon recovery of money or property of value in connection with the Adversary Action on behalf of the estate and_**

12

*will be subject to the Court's approval of a fee application to be filed by BNM at the conclusion of the Adversary Action*. BNM will charge only reasonable expenses in connection with the services rendered." Ex. D2 (¶ 7) (emphasis added). The Special Employment Application further repeated that BNM had previously incurred fees and expenses in the Veil-Piercing Action while representing the Creditor-Cadle in state court and that these would *not* be included in any fee application, but that the Creditor-Cadle would be permitted to file a proof of claim or even seek payment as an administrative claim of these *prepetition* fees and expenses. The Special Employment Application went on to state that BNM understood that it would have fiduciary duties only to the Chapter 7 Trustee and not to the Creditor-Cadle. Ex. D2 (¶ 8). BNM represented that it believed it was disinterested and had no conflicts of interest.

13. Attorney BA also submitted an Affidavit in support of the Special Employment Application. Ex. D3. In it, Attorney BA swore that "*No promises have been received by BNM or any of its partners or associates as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code*." Ex. D3 (¶ 3) (emphasis added). The Affidavit also stated that "Compensation to BNM will be paid at the conclusion of the Adversary Action if there is recovery of money or property for the benefit of the estate." Ex. D3 (¶ 5). There

13

were further representations that BNM had no relationship which
would raise disqualification or a conflict of interest.

14.  Meanwhile, right after the Special Employment
Application was filed, on August 25, 2006, a new adversary
proceeding (Adv. No. 06-3451) was filed in the bankruptcy court
by Attorney BA of BNM on behalf of Creditor-Cadle:  a complaint
objecting to the discharge of the Debtor-Moore, pursuant to
section 727 of the Bankruptcy Code (the "Section 727 Discharge
Action").

15.  On October 23, 2006, a hearing was held in the
bankruptcy court on the Special Employment Application, and the
same was orally approved, and a written Order was signed October
27, 2006 (the bankruptcy court finding, based on the
representations made by counsel, that there were no adverse
interests between BNM and the estate, with regard to the matter
on which BNM would be employed)[12] and, in fact, at that time, the
interests of the Chapter 7 Trustee, BNM, and Creditor-Cadle
seemed completely aligned with respect to the Veil-Piercing
Action.  Ex. D16 (p. 14).  A review of the transcript from the
October 23, 2006 hearing on the Special Employment Application
confirms that ***there was no disclosure of any special arrangements
whereby the Creditor-Cadle might pay BNM's fees and expenses in
connection with the Veil-Piercing Action*** (more to follow on

---

[12] *See* DE # 63 in Case No. 06-31859.

14

this). Ex. D16. There was no mention, either, of the newly filed Section 727 Discharge Action that had just recently been filed by BNM on behalf of the Creditor-Cadle (it was filed right *after* the submission of the Special Employment Application).

16. The Motion to Dismiss—as will later be further explained—is *almost entirely about critical nondisclosures by BNM and the Creditor-Cadle, of the financial arrangements and connections between them*, and how these *ultimately led to a conflict of interest that, in this court's view, has tainted the integrity of the entire legal proceedings*. As far as the "financial arrangements," at the three-day hearing on the Motion to Dismiss (specifically on August 11, 2011), a letter dated November 6, 2006, Ex. D27, was submitted into evidence ("November 6, 2006 Letter"). The November 6, 2006 Letter is the proverbial "smoking gun," and it had *never* been disclosed to the bankruptcy court or parties-in-interest until August 11, 2011. Notably, the November 6, 2006 Letter was dated just two weeks *after* the bankruptcy court hearing on the Special Employment Application. The November 6, 2006 Letter is addressed to Jeanne Isler (an account officer at the Creditor-Cadle)[13] from attorney Randall

---

[13] Jeanne Isler testified that she has been an employee of Creditor-Cadle for 13 years and it is her job to supervise attorneys and direct their work with regard to files on which she is the account officer. Jeanne Isler further testified that she worked on matters involving the Debtor-Moore from 2005 until December 2008. After December 2008, the Debtor-Moore legal matters became the

Lindley at BNM ("Attorney RL").[14]  The Chapter 7 Trustee credibly
testified that he had **never** seen the November 6, 2006 Letter
until August 11, 2011.  In the November 6, 2006 Letter, Attorney
RL states that "***The Cadle Company has agreed to pay our firm's
fees related to the prosecution of the adversary proceeding [the
Veil-Piercing Action] as well as representation of The Cadle
Company's interests as a creditor in the main case and its
unrelated action to deny discharge.  At the conclusion of the
case, assuming a positive result, we will request payment of all
of the fees and expenses incurred by our firm in the prosecution
of the adversary action [the Veil-Piercing Action].  Upon receipt
of payment from the Trustee, this firm will reimburse Cadle for
the fees and expenses it has actually paid our firm in connection
with the adversary proceeding.***"  Ex. D27.  Jeanne Isler was
asked, at the end of the November 6, 2006 Letter, to let Attorney
RL of BNM know if the letter did not accurately reflect Creditor-
Cadle's understanding.  Jeanne Isler confirmed in testimony on

---

responsibility of an employee at Creditor-Cadle named Carole Kendall.
Transcript from 9/27/2011 [DE # 224], pp. 6-10, & 45.  Jeanne Isler
further testified that the only other persons at Creditor-Cadle that
were involved in the Debtor-Moore matters were managers Michelle
Harris and John Benetis, who were occasionally consulted if there was
something about which she was unsure.  *Id.* at pp. 47-49.

[14] Attorney RL testified that he was the engagement partner and
originating attorney for Creditor-Cadle at the BNM law firm and
Creditor-Cadle had been a long-standing client of his for over 20
years.  Transcript from 9/27/2011 [DE # 224], p. 53 (lines 19-23).

September 27, 2011, that she recalled seeing this letter when it was sent to Creditor-Cadle and, indeed, she read it, and Creditor-Cadle agreed to pay BNM's fees incurred in representing the Chapter 7 Trustee in the Veil-Piercing Action.  Transcript from 9/27/2011 [DE # 224], pp. 16 (line 13) - 18 (line 10). Attorney RL testified that he prepared this letter in coordination with Attorney BA "Because he was the one that was handling this letter and he had wanted me to confirm our understanding that, under this circumstance, Cadle was going to fund this litigation. They were going to pay our fees and expenses.  . . . that was an agreement that [Attorney BA] had reached." *Id.* at p. 60 (lines 4-7; 22-23).

17.  The Chapter 7 Trustee testified credibly during the three-day hearing on the Motion to Dismiss that he first learned that the Creditor-Cadle had **perhaps** been paying BNM's fees in connection with the Veil-Piercing Action on April 15, 2008, at a hearing when Creditor-Cadle and/or Attorney BA mentioned it in court.  More to follow on this critical April 15, 2008 hearing later—suffice it to say that much happened between November 6, 2006 and April 15, 2008 in the bankruptcy court.

**D.   Significant Events Shortly After the Bankruptcy Court Approved the Employment of BNM as Special Counsel.**

18.  Recall that Creditor-Cadle filed a Section 727 Discharge Action on August 25, 2006.  This was just days after the Special Employment Application had been filed (on August 22,

17

2006). As mentioned earlier, the Section 727 Discharge Action
was never mentioned (not in the Special Employment
Application—naturally since the Section 727 Discharge Action had
not been filed quite yet—but also not at the October 23, 2006
hearing on the Special Employment Action). Frankly, the court is
not sure whether disclosure of this dual representation by BNM of
Creditor-Cadle in the Section 727 Discharge Action would have
troubled the court back in late 2006 or not. In any event, on
January 16, 2007, the Creditor-Cadle filed its First Amended
Complaint Objecting to the Debtor-Moore's Discharge, pursuant to
Section 727, adding a claim under section 727(a)(2). Creditor-
Cadle also asked, at this time, that the trial on this new
section 727(a)(2) portion of its Section 727 Discharge Action be
severed out and consolidated with the trial on the Veil-Piercing
Action (because of factual overlap). The court granted that
motion on March 5, 2007. DE # 27 in Veil-Piercing Action.

19. On April 18, 19 & 25, 2007, the bankruptcy court held a
trial in the Section 727 Discharge Action (not including the
section 727(a)(2) count that had been severed out and
consolidated with the Veil-Piercing Action). The court
deliberated for a few weeks after the trial but ultimately ruled
that the Debtor-Moore should be denied his discharge.[15]

---

[15] On May 15, 2007, the bankruptcy court issued findings of fact,
conclusions of law and a judgment denying the Debtor-Moore's
discharge, pursuant to various subsections of section 727.

18

20.   Meanwhile, towards the end of the trial on the Section 727 Discharge Action, on April 20, 2007, BNM filed a motion to withdraw as special counsel for the Chapter 7 Trustee (the "BNM Motion to Withdraw") *in the Veil-Piercing Action*.   Ex D4.[16]

21.   The BNM Motion to Withdraw stated, "***As reflected in the [Special Employment] Application***, it was the understanding of BNM (and Mims Trustee) that Cadle would ***assist with the expenses*** of continued prosecution of the [Veil Piercing] Action, particularly since it had initiated the State Court Action and had already incurred fees and expenses pre-petition . . . . It was BNM's understanding that its engagement as special counsel for Mims Trustee was ***contingent only as to fees*** incurred, but that it would not be responsible for the ***expenses*** of litigation.   Because the estate had no assets, BNM understood that Cadle would be paying those expenses."   Ex. D4 (¶ 10) (emphasis added).   First, these statements in the BNM Motion to Withdraw were inconsistent with the Special Employment Application (which ***never*** disclosed that the Creditor-Cadle would assist with the ***expenses*** of continued prosecution of the Veil-Piercing Action).   Moreover, these statements in the Special Employment Application were also inconsistent with the November 6, 2006 Letter between Jeanne

---

[16]   The Chapter 7 Trustee neither consented to nor opposed the withdrawal.   *See* Ex. D4; Transcript from 8/11/2011 hearing, p. 39 (lines 15-18).

19

Isler and Attorney RL (which actually reflected an agreement, or at least an expectation on the part of BNM, that Creditor-Cadle would pay all of BNM's **fees** related to the Veil-Piercing Action). Of course, the court did not know about the November 6, 2006 Letter until late 2011. In any event, the BNM Motion to Withdraw states that on "April 5, 2007, BNM learned definitively that Cadle was not willing to pay any **expenses** to assist Mims Trustee and the estate in the prosecution of the [Veil Piercing] Action." Ex. D4 (¶ 11). The BNM Motion to Withdraw goes on to say that although Cadle has indicated to BNM it is "willing to pay BNM's fees and expenses to litigate the section 727(a)(2) portion of the [Veil-Piercing] Action, BNM will not be permitted to act on behalf of the Trustee or in a manner which would assist the Trustee, without Cadle being assured that it will be compensated for such services and expenses related thereto. This presents a conflict of interest for BNM." Ex. D4 (¶ 13) (emphasis added).

22. In summary, BNM sought extrication from its special counsel role to the Chapter 7 Trustee (approximately six months after becoming employed) because it did not want to work for free and—still more—it did not want to bankroll litigation expenses. *See* Transcript, 8/11/2011 [DE # 203], at p. 113 (lines 3-6) (wherein Attorney BA testified, when asked, "what was the conflict of interest requiring your firm to withdraw as counsel for the Trustee but not withdraw for Cadle?", he answered: "Not

20

being paid."). Under different circumstances, this might be
sympathetic. But not when BNM and its Special Employment
Application had represented to the court and other parties-in-
interest that BNM was, indeed, working for free—and its fees and
expenses were contingent on recovery in the Veil-Piercing Action.

23. On May 15, 2007, the court conducted a hearing on the
BNM Motion to Withdraw and—while expressing how perplexed the
court was—denied it, due to BNM's failure to disclose any
condition that Creditor-Cadle would reimburse BNM's expenses in
the Special Employment Application and other supporting papers.
Attorney BA was not in attendance at such hearing, due to surgery
and illness. Attorney JL was there. Attorney JL stated, in
explaining the BNM Motion to Withdraw:

> The issue that's arisen is that under the
> initial agreement we had between Cadle and
> the trustee was that Cadle was going to fund
> the costs and expenses of the litigation in
> the removed action even though we were
> representing the trustee in that. And during
> discussions between Cadle and the trustee,
> Cadle decided that it was not going to fund
> those expenses for the removed action. And
> Bell Nunnally had agreed to represent the
> trustee contingent for fees but not for the
> expenses and costs.

Ex. D17, p. 6 (lines 16-25).[17] Attorney JL went on to state that
"Cadle instructed us that they didn't want us to do anything that
would benefit the trustee from a cost and expense standpoint . .

---

[17] It was also represented at the May 15, 2007 hearing that the
Chapter 7 Trustee had not found new counsel yet.

." *Id.* at p. 7 (lines 5-7).  While the explanation was a bit vague, the suggestion was that the Creditor-Cadle was interested in funding the litigation so long as there were section 727 issues involved, but not if it was about just recovering assets for the estate.  *Id.*

24. There was **much** discussion at the May 15, 2007 hearing about what had and had not been disclosed and what the various options were.  The Special Employment Application and order approving employment were pulled out and read during the hearing, as well as the court's own notes regarding oral disclosures at the hearing on the Special Employment Application and, **nowhere**, in all of the information reviewed, was there **any** disclosure that Creditor-Cadle would be funding fees or expenses in connection with the Veil-Piercing Action.  The court at one point said, "If there was an agreement, show me the agreement.  And it sounds like Cadle is in breach of the postpetition agreement with the trustee.  . . . If there wasn't an agreement, then Bell Nunnally is stuck in this thing." *Id.* pp. 15 (line 25)-16 (line 5).  The court further noted that if there was a documented agreement with Cadle, that the court had approved, "Cadle would now be reneging on the deal.  And we could enforce the deal, find Cadle in breach of the deal.  But I am not seeing any evidence of the deal, therefore, the Court cannot hold them to the deal, and so I'm left with who should be holding the bag here:  Bell Nunnally or

22

the trustee." Id.  p. 21 (lines 11-17).

25.  The bankruptcy court further stated that it was "really bothered" because it knew that:

> large creditors often care more about blowing
> a discharge and trustees often care more
> about recovering assets.  And, you know, this
> situation grows more troubling in my mind
> because I have just ruled that this debtor is
> not entitled to a discharge [in the Section
> 727 Discharge Action].  So this has a bad
> smell to it, that Cadle will have what it
> mostly wanted now, and it's going to leave
> the trustee to his own devices as far as
> waging the battle on the avoidance actions.

Id. at p. 24 (line 1-10).

26.  The court denied the BNM Motion to Withdraw (noting that withdrawal would put the Chapter 7 Trustee and estate "in a very bad situation"—as certain of the Defendants in the Veil Piercing Action had just filed a voluminous motion for summary judgment),[18] but the court indicated its ruling was without prejudice to BNM coming back and showing the court that somehow this expense-reimbursement arrangement had, indeed, been disclosed to the court after all.  Ex. D17, p. 25; Ex. D5 (Order Denying Motion to Withdraw, wherein court states that it is

---

[18] *See* Texas Disciplinary Rule of Professional Conduct 1.15 entitled "Declining or Terminating Representation," which outlines certain grounds or "good cause" that might justify withdrawal from representing a client, but withdrawal is ***always subject to a court not allowing it***.  See subsection (c):  "When ordered by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating representation."  Moreover, subsection (b)(1) mandates that, except in certain circumstances, withdrawal cannot be permitted unless "withdrawal can be accomplished without material adverse effect on the interests of the client."

23

"without prejudice" and that, if BNM reurged its Motion to Withdraw, the court expected that BNM would "present some proof that there was an agreement that The Cadle Company would pay the ongoing expenses of BNM in pursuing this matter on behalf of the Trustee that the court and the creditors had reason to know about"). BNM never did this.

27. The Chapter 7 Trustee acknowledged in testimony at the three-day hearing on the Motion to Dismiss that he somehow did have an understanding that the Creditor-Cadle would be funding **expenses** in the Veil-Piercing Action, but he did not know when or how he developed this understanding or why this did not somehow make it into BNM's Special Employment Application—he was deferring to Attorney BA on the drafting of that documentation (and, recall, the client—*i.e.,* the Chapter 7 Trustee—never signed the Special Employment Application). But Jeanne Isler of the Creditor-Cadle testified that there, in fact, was no special agreement that the Creditor-Cadle would pay expenses for the estate in connection with the Veil-Piercing Action, but she testified that the Creditor-Cadle also never refused to pay expenses generally—it just refused to pay a forensic accountant in connection with the Veil-Piercing Action. *See* Ex. P8 (p. 75).

**E.    Things Progress in the Veil-Piercing Action:  Denial of Summary Judgment, then Settlement.**

28. A couple of months later, on July 17, 2007, a motion for summary judgment, which was filed by one of the Defendants in

24

the Veil-Piercing Action, was argued and ultimately denied (on November 15, 2007) by the bankruptcy court in a lengthy opinion— which opinion laid out in significant detail some of the difficulties and complexity with regard to proving up a corporate reverse veil-piercing claim. DE ## 108-109.

29. Then, prior to any trial, on January 7, 2008, the Chapter 7 Trustee announced that a settlement agreement had been reached in the Veil-Piercing Action and, on January 24, 2008, the Chapter 7 Trustee (through Attorney BA and BNM) filed a motion to approve the settlement agreement (the "Settlement Motion"). Ex. D6. The settlement agreement contemplated that the Veil-Piercing Action would be settled and dismissed in exchange for a $37,500 aggregate cash payment from the Defendants ($35,000 from three Defendants and a separate $2,500 from another Defendant) to the Chapter 7 Trustee, on behalf of the bankruptcy estate. *Id.*

30. But, on February 18, 2008, the Creditor-Cadle (through a new attorney, Andrew Emerson) objected to the settlement agreement, asserting that Creditor-Cadle would pay $50,000 to acquire the claims asserted in the Veil-Piercing Action. Ex. D7.

31. An evidentiary hearing on the Settlement Motion was held on April 15, 2008. This was a critical hearing at which, the Chapter 7 Trustee would later credibly testify, he first learned that the Creditor-Cadle had perhaps been paying BNM's **legal fees** in connection with the Veil-Piercing Action. *See*

25

Transcript from 8/11/2011 [DE # 203], p. 30 (lines 17-25).
Specifically, at the April 15, 2008 hearing on the Settlement
Motion, the Creditor-Cadle's representative, Jeanne Isler,
testified that there was actually no written agreement with the
Chapter 7 Trustee for the Creditor-Cadle to pay the hard costs of
prosecuting the claims in the Veil-Piercing Action, but that the
Creditor-Cadle had paid bills, which Attorney BA then
characterized in questioning as "some bills," totaling $50,000 to
$60,000 towards the litigation. Jeanne Isler (and Attorney BA)
did not clearly indicate at the April 15, 2008 hearing that
Attorney BA and BNM were receiving *fee* payments from the
Creditor-Cadle for the representation of the Chapter 7 Trustee.[19]
And, certainly, there was no mention of the November 6, 2006
letter—even in the context of specific questioning about what had
Creditor-Cadle agreed to. In any event, the bankruptcy court
ultimately approved the settlement of the Veil-Piercing Action,
over the Creditor-Cadle's objection. The bankruptcy court
believed that the proper analysis was whether the settlement was
fair and equitable. *See, e.g., Protective Comm. for Indep.
Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S.

---

[19] *See* Ex. P8. At one point during Jeanne Isler's testimony, she
suggested that Creditor-Cadle had offered to pay BNM's fees and
expenses (*id.,* p. 75 (lines 3-4)) and had, in fact, been "paying the
attorney bills" (*id.,* p. 75 (line 6); p. 82 (lines 2-10)), but several
other times, Jeanne Isler used the term "expenses," suggesting that
Creditor-Cadle was merely paying ***expenses*** associated with the
Adversary Proceeding (*id.,* p. 74 (lines 8-18); p. 75 (lines 8-14;
lines 25); p. 76 (lines 15-22); p. 81 (lines 3-16)).

414, 424 (1968) (court may approve compromise only when "fair and equitable"; court must compare terms of compromise with likely rewards of litigation); *U.S. v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293 (5th Cir. 1984), *cert. denied,* 469 U.S. 880 (1984) (court should review factual information to determine if settlement is fair and equitable to creditors).

32. To be clear, it was not at all apparent, from testimony at the April 15, 2008 hearing, what Creditor-Cadle had or had not been paying BNM in connection with the Veil-Piercing Action. To put this into context, the April 15, 2008 hearing was a hearing regarding a Settlement Motion that the Chapter 7 Trustee had proposed with regard to the Veil-Piercing Action. The Chapter 7 Trustee had determined, in his business judgment, after several months of litigation (and a motion for summary judgment skirmish) to simply compromise the Veil-Piercing Action with the Defendants in exchange for $37,500 cash. Creditor-Cadle filed an objection to the settlement (and showed up at this point with different counsel, Andrew Emerson). And at the hearing, there was testimony from, among other witnesses, Creditor-Cadle (Jeanne Isler) who at this point opposed the Chapter 7 Trustee's proposed settlement because Creditor-Cadle now wanted to purchase the Veil-Piercing Action and pursue it on its own. *See* Ex. P8, p. 74 (line 80) – p. 76 (line 22). The real thrust of the April 15, 2008 hearing was whether the settlement agreement was fair and

27

equitable and should be approved.  The bankruptcy court ultimately approved the Settlement Motion (the "Settlement Order").

33.  The Chapter 7 Trustee credibly testified on August 11, 2011 that he was "shocked" when he heard the various statements from Jeanne Isler and Attorney BA at the April 15, 2008 settlement hearing, and that he told Attorney BA that they needed to amend the Special Employment Application and disclose to the bankruptcy court the details of whatever was being paid to BNM. *See* Transcript, 8/11/2011 [DE # 203], at pp. 30 (line 22) – 31 (line 25); p. 47 (lines 9-16).  *See also id.* at p. 70 (lines 4-9) ("when I heard the disclosure by [Attorney BA] at the hearing was [sic] Cadle had paid 60,000 dollars or so was that he amend the application to make it true and correct to the Court and advise the Court.  . . . that hasn't been done.  And I requested it on several occasions and very forcefully.").

34.  Attorney BA and BNM never amended their disclosures to the bankruptcy court.

35.  In any event, the issue was dormant—for lack of a better term—for a significant time in the bankruptcy court.  This was because Creditor-Cadle appealed the Settlement Order, on May 2, 2008, and there was virtually no activity in the bankruptcy court for more than two years after the April 15, 2008 hearing.

36.  But later testimony would reveal that Creditor-Cadle

paid BNM invoices for fees and expenses for BNM's representation of the Chapter 7 Trustee from October 23, 2006 (when the bankruptcy court first approved BNM's employment—without it being disclosed the Creditor-Cadle would be paying BNM's fees and expenses) through February 12, 2009.  Attorney BA at one point admitted that there was a conflict of interest between the Chapter 7 trustee and Creditor-Cadle, at least as early as the time Creditor-Cadle objected to the Chapter 7 Trustee's Settlement Motion and decided it wanted to try to purchase the Veil-Piercing Action for itself (which would have been February 18, 2008).  *See* Transcript from 9/27/11 hearing [DE # 224], at p. 115 (lines 1-20).  In any event, Creditor-Cadle paid the attorneys for the Chapter 7 Trustee (BNM):  (a) for well over two years without a disclosure to the bankruptcy court, as required by Bankruptcy Code section 327 and Bankruptcy Rule 2014 (*i.e.,* from October 23, 2006 through February 12, 2009); and (b) for approximately one year after becoming directly adverse to the Chapter 7 Trustee  (*i.e., from February 18, 2008 through February 12, 2009*).

**F.   The Appeals in Connection with the Settlement of the Veil-Piercing Action.**

37.  On May 2, 2008, as earlier mentioned, the Creditor-Cadle appealed the bankruptcy court's Settlement Order to the District Court.  DE # 114 (in Main Bankruptcy Case # 06-31859).  BNM (through Attorney BA) represented the Chapter 7 Trustee

throughout the District Court appeal. Attorneys Andrew Emerson and Bruce Thomas represented Creditor-Cadle. As set forth in the preceding paragraph, **Creditor-Cadle continued to pay BNM's legal fees and expenses for BNM's representation of the Chapter 7 Trustee, in his role as appellee, adverse to appellant, Creditor-Cadle, until February 12, 2009**. When asked whether Attorney BA or BNM thought this was a problem, Attorney BA testified incredulously as follows:

> Q: And didn't that cause you—
> A: But—
> Q: —or anybody at your firm to say, "My God. We've been paid to work both sides of the same appeal, and this was wrong?"[20]
> A: Because there was no conflict.
> Q: There was no conflict between—
> A: There is no conflict.
> Q: —you representing one side of an appeal and another side of an appeal and being paid by the same party to do that?
> A: There was no conflict.

Transcript of 9/27/11 hearing [DE # 224], pp. 116 (line 16) – 117 (line 1).

38. The District Court affirmed the bankruptcy court's Settlement Order on March 26, 2009. Ex. P14.

---

[20] To be clear, the totality of the evidence was that **Creditor-Cadle** was paying both sides of the appeal (*i.e.,* it was paying the lawyers representing Creditor-Cadle in the appeal, Messrs. Emerson and Thomas, and it was also paying the lawyers representing the Chapter 7 Trustee in the appeal, BNM). BNM was not being paid twice in connection with the appeal and was not technically working both sides of the appeal. It was just being paid by its client's adversarial opponent. And, by the way, as will later be discussed, BNM was meanwhile representing its client's adversarial opponent (Creditor-Cadle) on other, unrelated matters.

39. Then, on June 8, 2009, Creditor-Cadle appealed the
District Court's decision to the Fifth Circuit Court of Appeals.
Ex. P15. Once again, BNM (through Attorney BA) represented the
Chapter 7 Trustee in connection with the Fifth Circuit appeal—**at
least at first**—and attorneys Andrew Emerson and Bruce Thomas
represented Creditor-Cadle.

40. Note, that by this point, no one was paying BNM for its
legal work for the Chapter 7 Trustee (Creditor-Cadle having
finally ceased paying BNM's legal invoices in February 2009).
Briefing was submitted to the Fifth Circuit and the Fifth Circuit
ultimately set oral argument on January 11, 2010 (setting the
oral argument for March 2, 2010). But, around all of this time,
attorney BA left the BNM law firm.

41. Specifically, Attorney BA left BNM on March 1, 2010
(the day before oral argument was to occur; but six weeks after
oral argument had been scheduled) and joined another law firm.
*See* Transcript of 9/27/11 hearing [DE # 224], p. 161 (lines 16-
21).

42. It appears to this court, based on extensive testimony,
that the decision of who would make the oral argument at the
Fifth Circuit on behalf of the client, the Chapter 7 Bankruptcy
Trustee, was very ineptly handled—on the part of both Attorney BA
and BNM—and certainly this calls into doubt their sense of
loyalty owed to their client. Attorney BA testified as follows

31

on this subject:

THE COURT:  As I understood it, you left [BNM] in February 2010.  Correct?

THE WITNESS:  March.  March 1.

THE COURT:      March 1?

THE WITNESS:  The day before the Fifth Circuit argument.  Or a couple days.

THE COURT:  How was the transition handled of the [appeal] matter in connection with your leaving?

THE WITNESS:  Well, the only thing pending was oral argument in the Fifth Circuit.  That was the only thing pending.  And so it was chaos, trying to move.  And literally, it was a two-week window, trying to move. So I said, "Just keep the file here and I'll move over there and we'll see–we'll just–you guys hold the file. I'll go here."  And [the Chapter 7 Trustee] knew that I was switching firms.  And we would say–we just basically agreed that we would wait and see what the Fifth Circuit says.

THE COURT:  Okay.  So [the Chapter 7 Trustee] knew? Tell me about, again, how that transition happened. You called him up, I guess.

THE WITNESS:  No, I think it was probably just–I think Your Honor, I think it was just probably e-mail.  I don't remember a phone call.

* * * *

THE COURT:  Did he–he didn't specifically consent to someone else doing the oral argument?  You –

THE WITNESS:  No, I–I said, "[BNM's] keeping the file. They're keeping the representation.  I don't have time to transition over.  . . . And it was like, it just was notice.  I just notified him.  And I mean, we didn't–I don't recall we had a telephone call, but it was like there was no issue.

* * * *

32

THE COURT:  But did you give [the Chapter 7 Trustee] the option, "If you want to retain me at my new firm, I'll go forward and try to run the conflicts check and see if that's doable"?

THE WITNESS:  I don't know that—again, I don't have those e-mails.  I don't.  But I will be honest with you, I don't know if it got [to] that level.  I think it was just—it happened quickly.

* * * *

THE COURT:  Your former partner testified, [Attorney RL], that he was "under the impression [Attorney BA] was going to take over the matter" when you moved to Cantey Hanger.

THE WITNESS:  Uh-huh.  Yes.

THE COURT:  Somehow that didn't happen, and I'm trying to figure out why it didn't happen, whose decision it was that the matter would stay at [BNM].

THE WITNESS:  Well, I'm not sure.  . . .

* * * *

THE COURT:  I'm wanting to know who made the decision.

THE WITNESS:  I don't know.  There was no—it—

THE COURT:  Who were the possible decision-makers?

THE WITNESS:  You're assuming a decision was made.

THE COURT:  Whose decision was it to make?

THE WITNESS:  Mr. Mims [*i.e.,* the Chapter 7 Trustee].

Transcript from 9/27/11 hearing [DE # 224] at p. 161 (line 16) - p. 162 (line 13); p. 163 (lines 8-19); p. 164 (lines 4-10); p. 165 (line 22)- p. 166 (line 4); p. 166 (lines 13-19).

43.  Attorney RL testified that he vaguely recalled that he and Attorney BA discussed that Attorney BA would take the

33

representation of the Chapter 7 Trustee with him to his new firm, but that did not happen for several weeks, he thought, after Attorney BA left BNM, and Attorney RL does not recall how a decision was made regarding who specifically would make arguments for the Chapter 7 Trustee at the Fifth Circuit. *See id.* [DE # 224], at pp. 85 (line 70) - 91 (line 18).

44. In any event, ultimately, some ambiguous person (either Attorney BA or someone else at BNM) made the decision that a first-year bankruptcy associate at BNM would make the oral argument with regard to the appeal of the Settlement Order to the Fifth Circuit. Attorney BA attended the oral argument, but he did not argue. The court emphasizes these facts because the Special Employment Application, which approved BNM as special counsel to the Chapter 7 Trustee, provided that Attorney BA and Attorney JL—both with more than 20 years of legal experience and the ones who had represented the party—plaintiff in the Veil-Piercing Action prior to the Chapter 7 Trustee substituting in as party-plaintiff—would be the primary attorneys working on the matter for the Chapter 7 Trustee. *See* Ex. D-1. While, certainly, a law firm has flexibility to bring other attorneys into an engagement (and the Engagement Letter did not preclude that), the surrounding circumstances here give every indication of the Chapter 7 Trustee having been treated like the proverbial "hot potato." The "surrounding circumstances" are that:

(a) Attorney BA and BNM had the undisclosed expectation that Creditor-Cadle would be funding their legal fees representing the Chapter 7 Trustee in the Veil-Piercing Action *ad infinitum.*

(b) But that had abruptly stopped.

(c) When Attorney BA and BNM split the sheets, so to speak (*i.e.,* separated their legal association), just before the Fifth Circuit oral argument, it appears that no one wanted to hold the "hot potato" (*i.e.,* the Chapter 7 Trustee) for free.  But BNM was left holding the "hot potato," by virtue of the terms of the Special Employment Application and order—for these documents had proposed employment by the Chapter 7 Bankruptcy Trustee of **BNM**.

(d) Someone, therefore, at BNM assigned the "hot potato" to a very new, lower-rate lawyer.

(e) The evidence further revealed that, apparently, Attorney BA has done work for Creditor-Cadle since leaving BNM; and, of course, Attorney RL testified Creditor-Cadle has long been his client.

(f) This whole scenario has the unpleasant odor of no one really wanting to argue before the Fifth Circuit against one of their most favored clients (not Attorney BA, who might be courting Creditor-Cadle at his new law firm, and not BNM, who had been representing Creditor-Cadle for more than 20 years).  Thus, without obtaining the consent of—or any meaningful input from—the client to whom they each owed a duty of loyalty (*i.e.,* the Chapter 7 Trustee) a decision was made to send a first-year lawyer to argue at the Fifth Circuit for the Chapter 7 Trustee against Creditor-Cadle.

45.  On June 2, 2010, the Fifth Circuit reversed the Settlement Order, holding that the bankruptcy court should have considered the Creditor-Cadle's willingness to pay $12,500 more for the litigation claims asserted in the Veil-Piercing Action than the consideration that the Chapter 7 Trustee would achieve through the proposed settlement (*i.e.,* the bankruptcy court

35

should have considered auction and sale procedures for the causes of action to potentially recover the highest value for the estate).

## G. Remand to the Bankruptcy Court and the Revelation of Conflicts.

46. After remand to the bankruptcy court, on February 4, 2011, the Chapter 7 Trustee filed a motion to sell the litigation claims asserted in the Veil-Piercing Action. Ex. D10. An auction was held on March 25, 2011, and the litigation claims were purchased by Creditor-Cadle, the high bidder, with a lackluster winning bid of $41,500 ($4,000 more consideration to the bankruptcy estate than the Settlement Order had contemplated approximately three years earlier). Ex. D11. A marvelous result? Hardly. The sale order approving the sale was issued on April 11, 2011. *Id.*

47. At the April 11, 2011 sale hearing, in the midst of this lackluster result, Attorney BA appeared—purportedly on behalf of the Chapter 7 Trustee—seeking a continuance of the trial date in the Veil-Piercing Action. At that point, the bankruptcy court raised questions as to whom exactly Attorney BA considered himself to be representing? On the one hand, Attorney BA had apparently not felt like he could represent the Chapter 7 Trustee at the Fifth Circuit oral arguments—because he had gone to a new firm. Now, suddenly, Attorney BA was filing pleadings for the Chapter 7 Trustee. But the Chapter 7 Trustee indicated

36

that he had not instructed Attorney BA to seek a continuance or even talked to him about it.  Attorney BA's actions had all the appearance of him seeking a continuance for the benefit of Creditor-Cadle, which had just newly purchased the claims in the Veil-Piercing Action.  *See* Ex. P-9.

48.  It was at this point that the bankruptcy court ordered a short continuance of the trial docket call in the Adversary Proceeding to April 26, 2011, and also indicated that, as part of that trial docket call, the court wanted a representative of Creditor-Cadle to be present to address some of the conflicts issues that had seemed to percolate to the surface.  *Id.* at 50-54.

49.  On April 26, 2011, Creditor-Cadle's representative, Carole Kendall, testified before the bankruptcy court at the trial docket call as follows:

> (a) that Creditor-Cadle was not able to find "any written agreements" or other arrangements that it had to pay BNM's fees and expenses, although there had been "verbal discussions about it" and Creditor-Cadle just began paying the invoices;
>
> (b)  Creditor-Cadle paid $92,000 worth of BNM invoices relating to BNM's representation of the Chapter 7 Trustee over an approximately two-year period;
>
> (c) that Creditor-Cadle had been simultaneously paying BNM invoices for representing the Chapter 7 Trustee while Creditor-Cadle was adverse to the Chapter 7 Trustee in the appeal of the Settlement Order;
>
> (d) while Attorney BA and BNM were representing the Chapter 7 Trustee, and Creditor-Cadle was paying the bills for that, Attorney BA and BN&M were also

37

representing Creditor-Cadle in unrelated matters;

(e) she believed that Attorney BA, since his move to his new law firm, had represented Creditor-Cadle in at least one other matter; and

(f) in or about December 2008, Creditor-Cadle informed Attorney BA and BNM that it would no longer pay the legal fees of BNM incurred on behalf of the Chapter Trustee (and the last bill actually paid was paid on February 12, 2009).

Ex. P10, p. 22 (line 22) – p. 32 (line 6). *See also* Transcript from 9/27/2011 [DE # 224], p. 75 (lines 8-14).

50. Upon hearing this testimony, the Defendants in this Veil-Piercing Action filed their Motion to Dismiss this Adversary Proceeding for Abuse of Judicial Process, arguing among other things that the "payment of an adverse party's counsel by Cadle is a manifest abuse of the judicial system and abuse of process or, in the alternative, creates such an appearance of impropriety so as to taint the entirety of the adversary proceeding—from settlement through reversal on appeal by the Fifth Circuit. Motion to Dismiss, at p. 2. The Defendants have further suggested that Attorney BA and BNM may have taken a "dive" or a "lay down" at the Fifth Circuit in the interest of not offending their favored client Creditor-Cadle (by sending an unseasoned, young attorney to make the oral argument for the Chapter 7 Trustee).

51. As alluded to earlier, Attorney BA's testimony in this regard, at the three-day hearing on the Motion to Dismiss, was

38

amazingly cavalier and certainly did not go very far in assuaging the court's or anyone else's concern.  Attorney BA testified that the Chapter 7 Trustee understood from the beginning of BNM's retention that Creditor-Cadle would be paying BNM's fees along the way.  *See* Transcript, 8/11/2011 [DE # 203], at p. 100 (lines 20-25).  Sadly, the court found this testimony to be not at all credible (when asked if he ever confirmed any of this in writing, Attorney BA stated "I – I vaguely recall a discussion – several discussions").  *Id.*

52.  Not only does the court not find the testimony credible—when juxtaposed against the Chapter 7 Trustee's **adamant** and seemingly genuine testimony in this regard—but it is inexplicable that such a detail would not be found in writing **anywhere**—not to the Chapter 7 Trustee, and not on file with the bankruptcy court.  *See, e.g.,* Bankruptcy Rule 2014 (stating that an employment application for a professional seeking to represent a trustee "shall state," among other things, "any proposed arrangement for compensation" and "all of the person's connections with . . creditors" and a verified statement of the person to be employed as to such connections).

53.  At the three-day hearing on the Motion to Dismiss, invoices were submitted into evidence reflecting BNM's services relating to the Adversary Proceeding.  Exs. D20 & D25.  The invoices show "Jeffrey Mims" (the Chapter 7 Trustee) as the

addressee/recipient.  The invoices span from time entries on
October 23, 2006 through November 30, 2008.  **_The Chapter 7_**
**_Trustee credibly testified that he had never received these_**
**_billing invoices from BNM._**  _See_ Transcript from 8/11/2011 [DE #
203], p. 33 (lines 2-22).[21]  The Chapter 7 Trustee also credibly
testified that he did not know of these invoices being sent to
Creditor-Cadle and **_he did not authorize them to be sent to them_**
**_and specifically did not authorize sending any invoices to_**
**_Creditor-Cadle that might have contained recordings of_**
**_confidential communications between the Chapter 7 Trustee and_**
**_BNM._**  _Id._ at p. 56 (lines 3-25); _see also id._ at p. 79 (lines 13-
15) ("again, my testimony is that no invoices should have, under
any circumstances, been sent on my behalf to Cadle Company.  I
was not aware of that.").  The Chapter 7 Trustee believes that
attorney-client privileged information or confidences (that
should have been only matters shared between him and BNM) were
revealed many places in those invoices.  _See_ Transcript from
8/11/11 hearing [DE # 203], at p. 55 (line 6) – p. 60 (line 7).
_See also_ P-20 (time entries in BNM invoices for the following

---

[21] Attorney RL from BNM testified that he believed that he started
sending invoices for BNM's services as special counsel to the Chapter
7 Trustee sometime in early 2009 after Creditor-Cadle stopped paying
the invoices.  Transcript from 9/27/2011, [DE # 224], pp. 64 (line 230
- 65 (line 15) & 81 (lines 9-11).  However, Attorney RL's recollection
was admittedly vague and **_no BNM invoices for services after November_**
**_2008 were even produced at the three-day hearing_**.

dates: 2/8/08; 2/18/08; 3/3/08; 3/7/08; 3/11/08; 3/12/08; 3/21/08; 3/24/08; 3/25/08; 3/27/08; 4/9/08; 5/5/08; 7/3/08).[22]

54.  The invoices also show multiple communications over time between attorneys at BNM and individuals at Creditor-Cadle. Ex. D20 and Ex. D25 (more than a dozen, by the court's count). The most troubling ones seem to be those *after* February 2008, when Creditor-Cadle became adverse to the Chapter 7 Trustee and had its own counsel-of-record in the bankruptcy case.  Ex. D20 (see entries at least on 3/3/08 and 3/10/08).

55.  To be clear, the evidence was that Creditor-Cadle *did* receive the BNM invoices (unredacted), carefully reviewed them, and paid them.  Transcript from 9/27/11 [DE # 224], pp. 10 (line 3) - 16 (line 2); 31 (lines 8-10); 49 (line 11) - 50 (line 7). And Jeanne Isler, when being questioned about the various invoices sent to Creditor-Cadle, confirmed that she engaged in (and was billed for) "a conversation with [Attorney-BA] concerning what strategy options were available to Cadle in light of the Trustee entering into a settlement agreement with the

_____

[22] Exs. D20 & D25, which were submitted at the three-day hearing on the Motion to Dismiss (which were BNM invoices), contain some redactions throughout.  The Chapter 7 Trustee credibly testified that his general bankruptcy counsel had made these redactions, on the Chapter 7 Trustee's behalf, after Creditor-Cadle produced the invoices in discovery to the Chapter 7 Trustee—there being a concern that attorney-client privileged information was revealed in the invoices and, presumably, the Chapter 7 Trustee did not want to exacerbate the situation any further by revealing attorney-client privileged information yet again in this matter.  Transcript from 8/11/2011 [DE # 203], pp. 56 (line 2) - 57 (line 1).

Defendants [in the Veil-Piercing Action]."  Transcript from
9/27/11 [DE # 224], p. 27 (lines 11-10).

56.  As mentioned earlier, Attorney BA's attitude in
connection with all of this was mostly devoid of any regret or
concern—except, perhaps, at the suggestion by the Defendants that
he and BNM took a "lay down" or dive at the Fifth Circuit for the
benefit of their more favored-client, Creditor-Cadle (to the
detriment of the Chapter 7 Trustee and other parties-in-interest
in the bankruptcy case).  See Transcript of 9/27/11 hearing [DE #
224], p. 154 (lines 1-4) ("It was not pay-to-play.  . . . There
was no lay-down at the Fifth Circuit.").  At one point in his
testimony, Attorney BA did acknowledge that perhaps some things
might have been done differently:

> THE WITNESS:  In hindsight, I would have-I would have
> probably, looking back, looking at it today, I would
> say I probably should have disclosed it.  But I have
> to-I'd have to research it and check it out.  But I
> don't think it's-like I said, it didn't affect
> anything-
>
> THE COURT:  All right.
>
> THE WITNESS:  -in terms of the representation.
>
> THE COURT:  Let me ask you this.  Were you, [Attorney
> BA], representing Cadle on other unrelated matters at
> the same time you were representing [the Chapter 7
> Trustee]?
>
> THE WITNESS:  Yes.
>
> THE COURT:  Is that disclosed in your employment
> application?
>
> THE WITNESS:  Whatever it says.

42

*Id.*, p. 154 (lines 10-23).

57.  Attorney BA also confirmed that there was not any ethical wall in place at BNM with regard to the Creditor-Cadle/Chapter 7 Trustee representation.  *Id.* at p. 156 (lines 8-17).

58.  Finally, Attorney BA also confirmed that, at the April 15, 2008 hearing in the bankruptcy court on the Settlement Motion, that the Chapter 7 Bankruptcy Trustee expressed shock to him that Creditor-Cadle was paying BNM's fees and the trustee said that this was previously unknown to the trustee and he was troubled that it had not been disclosed.  Attorney BA confirmed that the Chapter 7 Trustee told Attorney BA "you need to go and amend your application or your affidavit."  And Attorney BA testified that he said in reply "I'll take that [under advisement] and think about it" but he never went back and amended his Special Employment Application or affidavit in support thereof.  *Id.* at pp. 143 (line 15) - 144 (line 8).

59.  Attached hereto, in an Appendix to this Memorandum Opinion, is a time table summarizing the key events in this Adversary Proceeding.

### III.  CONCLUSIONS OF LAW

A.  Section 327 of the Bankruptcy Code permits a bankruptcy trustee to employ one or more lawyers (among other professional persons) that ***do not hold or represent an interest adverse to the***

43

*estate*, and that are ***disinterested persons***, to represent or assist the trustee in carrying out the trustee's duties under the Bankruptcy Code.  Further, a person is not *per se* disqualified for employment solely because of such person's representation of a creditor.  *See* 11 U.S.C. § 327(c).  If a proposed attorney for the trustee represents a creditor, and a party-in-interest objects (which, by the way, ***did*** happen in this case in 2006), the bankruptcy court must look to whether there is an actual conflict of interest.  *Id.*  Conflicts of interest are often a matter of degree.  They are fact-intensive analyses.

B.   So how does a bankruptcy court ascertain if there is an actual conflict of interest?  Bankruptcy Rule 2014 is designed to help in this regard.  Bankruptcy Rule 2014 states that an employment application for a professional person seeking to represent a trustee "shall state," among other things, "any proposed arrangement for compensation" and "all of the person's connections with . . creditors" and a verified statement of the person to be employed as to such connections.  In other words, there are critical disclosures contemplated so that conflicts of interest can be identified and analyzed.

C.   The disclosures filed with the bankruptcy court in the case at bar, by Attorney BA and BNM, pursuant to Bankruptcy Code section 327 and Bankruptcy Rule 2014, were amazingly inadequate. Not only did such disclosures not reveal the level and extent to

44

which Creditor-Cadle was a current client of BNM on unrelated matters, but there was an utter failure to disclose that Creditor-Cadle would be paying BNM concurrently for its representation of the Chapter 7 Trustee in the Veil-Piercing Action. There was no disclosure that Creditor-Cadle might be reimbursing BNM's expenses and there was no disclosure that Creditor-Cadle might be paying all of BNM's bills (*i.e.,* fees and expenses). And yet Creditor-Cadle agreed to do just that, as reflected in the November 6, 2006 Letter, and Creditor-Cadle subsequently paid $92,000 of fees and expenses incurred by BNM in representing the Chapter 7 Trustee—and much of these payments occurred during a time when BNM and the Chapter 7 Trustee were adverse to Creditor-Cadle (including during appeals). This is inexcusable. It is baffling. Not only is it inexcusable and baffling, but the circumstances are highly suspect—given that the November 6, 2006 Letter (documenting the agreement whereby Creditor-Cadle agreed to pay BNM's fees and expenses in connection with representing the Chapter 7 Trustee) was executed just days **after** the bankruptcy court approved BNM's employment as special counsel to the Chapter 7 Trustee. Moreover, it is inexcusable and baffling, since in mid-2007, when BNM filed its Motion to Withdraw, the bankruptcy court questioned BNM extensively **about what had or had not been agreed to**—inviting BNM to supplement the record—and BNM never did. Bankruptcy requires

45

an open kimono when it comes to possible conflicts. Here, there was no open kimono. There was no transparency. In fact, Attorney BA explicitly represented that: "***No promises have been received by BNM or any of its partners or associates as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code***." Ex. D3 (¶ 3) (emphasis added). The Affidavit also stated that "Compensation to BNM will be paid at the conclusion of the Adversary Action if there is recovery of money or property for the benefit of the estate." Ex. D3 (¶ 5).

D. Section 328 of the Bankruptcy Code contemplates that a bankruptcy court may deny allowance of compensation for services of a professional person employed under section 327 if at any time during such person's employment he is not a disinterested person or holds an interest adverse to the interest of the estate with respect to the matter on which such person is employed.

E. Here, section 328 does not give the bankruptcy court many options. BNM has not and will not file a fee application in this case and it has not been paid any fees and expenses from the estate. The court is not in a position to disallow compensation. And disgorgement of fees and expenses (*i.e.,* ordering BNM to repay the fees Creditor-Cadle paid it) seems very unsatisfactory under the circumstances.

F. Moreover, there is more that has happened here than

46

simple nondisclosure. As was earlier discussed, it appears that the Chapter 7 trustee's special counsel (BNM and Attorney BA) also breached their duties to maintain attorney-client confidences (by sending confidential or privileged information to BNM's other client, Creditor-Cadle)[23] and also failed to follow instructions given to them by their client, the Chapter 7 Trustee. As earlier discussed, when the Chapter 7 Trustee learned that Creditor-Cadle was paying the fees of the Chapter 7 Trustee's special counsel, he demanded that this be disclosed to the bankruptcy court, but Attorney BA and BNM took it "under advisement" and never followed the client's instructions and disclosed it. Transcript of 8/11/11 Hearing [DE # 203], at pp. 30 (line 22) - 31 (line 25).

G. It is hard in this case to determine who bears more responsibility for the missteps: the attorneys or Creditor-Cadle. Clearly, in addition to failing to comply with Bankruptcy Code section 327 and Bankruptcy Rule 2014, Attorney BA and perhaps others at BNM breached duties of loyalty to their client (the Chapter 7 Trustee) and, it appears, may not have represented him in the most competent and diligent way. *See, e.g.,* Rule 1.01

---

[23] *See* Rule 1.05, Texas Disciplinary Rules of Professional Conduct. Recall that, unbeknownst to the trustee, his special counsel was sending billing invoices to Creditor-Cadle for many months, but not to the Chapter 7 Trustee. These invoices contained narrative descriptions of the services that were being provided to the trustee by his special counsel, and, in some instances, it appears that privileged strategy and communications were revealed.

47

of the Texas Disciplinary Rules of Professional Conduct:

> (b)  In representing a client, a lawyer shall not:  (1)
> neglect a legal matter entrusted to the lawyer; or (2)
> frequently fail to carry out completely the obligations
> that the lawyer owes to a client or clients.
>
> (c)  As used in this Rule, "neglect" signifies
> inattentiveness involving conscious disregard for the
> responsibilities owed to client or clients.

In failing to follow the instructions of the Chapter 7 Trustee in

making disclosures to the bankruptcy court, and in failing to

meaningfully consult with the Chapter 7 Trustee regarding who

would make the Fifth Circuit oral argument in matters on appeal,

it would appear that Rule 1.01 is implicated and has been

violated.  Additionally, as earlier discussed, it appears that

attorney-client confidences were shared between BNM and Creditor-

Cadle without the Chapter 7 Trustee's consent.  All of this is

severely problematic.

H.  But the problematic behavior lies not merely at the feet

of Attorney BA and BNM, but also at the feet of Creditor-Cadle.

This is not just a case of rogue attorneys.  Creditor-Cadle has

some accountability in all of this.  Creditor-Cadle is a

sophisticated party that regularly hires lawyers to monetize

assets.  Here, as earlier stated, the bankruptcy court believes

that the very temple of justice has been defiled.  Here, there is

not merely a situation of lawyers representing a bankruptcy

trustee that were conflicted and compromised by loyalty to

another client.  Creditor-Cadle itself failed twice to testify

48

candidly about the exact financial arrangements it had with BNM
(as set forth in the November 6, 2006 Letter):  both on April 15,
2008 and again on April 26, 2011.  Creditor-Cadle is, again, a
sophisticated party.  BNM and Attorney BA were Creditor-Cadle's
trusted lawyers.  It appears that Creditor-Cadle was happy for
awhile to quietly pay BNM while BNM ostensibly represented the
Chapter 7 Trustee.  But then, after a year of paying both sides
of litigation and an appeal, someone at Creditor-Cadle said "no
more."

    I.   None of us (or—none of us except Creditor-Cadle and
BNM) know who exactly said what to whom when Creditor-Cadle
stopped paying BNM's bills in February 2009, but we do know that
fairly soon thereafter (when oral arguments came up before the
Fifth Circuit Court of Appeals) the regular lawyer for the
Chapter 7 Trustee, that had left BNM just days before, sat
silently by, while a first-year lawyer argued for the Chapter 7
Trustee.

    J.   There is enough here to connect the dots.  And it is not
pretty.  BNM and attorney BA had divided loyalties, and Creditor-
Cadle was fine with that—it benefitted Creditor-Cadle having
"its" lawyers on the other side of it in litigation.  The various
nondisclosures and conflicts of interest attributable to the
Creditor-Cadle and its counsel (at both the bankruptcy court
level and throughout much of a multi-month appeal) were so

49

serious, so improper, and so demonstrative of callous indifference to applicable duties and ethical standards, that the entire Adversary Proceeding has been tainted.  In the world of bankruptcy, lawyers are not only bound by the Rules of Professional Conduct, but lawyers and parties must abide by the Bankruptcy Code and Bankruptcy Rules.  Bankruptcy Code section 327 and Bankruptcy Rule 2014 were totally side-stepped here.

K.   "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Here, the court believes the evidence is clear and convincing that Creditor-Cadle and Attorney BA acted in bad faith and recklessly disregarded their duties.  Thus, the "death penalty" (*i.e.,* dismissal with prejudice) in this Adversary Proceeding seems entirely fitting.

## IV.  CONCLUSION AND ORDER

Based upon the foregoing, it is hereby **ORDERED** that:

1.  The Adversary Proceeding is dismissed with prejudice for abuse of judicial process attributable to Creditor-Cadle.

2.  The Supplements (seeking vacatur of the Sale Order) are denied.

3.  The *Stern* Motion is denied.

4.  All other relief sought by any party (including Defendants' requests for reimbursement of attorneys' fees) is denied.

The court will issue a separate order to address the conduct of Attorney BA.

**IT IS SO ORDERED.**

### END OF MEMORANDUM OF OPINION AND ORDER ###

## TIME LINE OF SIGNIFICANT EVENTS

| | |
|---|---|
| July 5, 2006 | Removal of Veil-Piercing Action to bankruptcy court. |
| Aug. 15, 2006 | Engagement letter between BNM & Chap. 7 Trustee. |
| Aug. 22, 2006 | BNM Employment Application and Affidavit filed. |
| Aug. 25, 2006 | Discharge Adversary Proceeding (§ 727) filed by BNM for Cadle. |
| Oct. 23, 2006 | Hearing on BNM Employment Application (invoices start). |
| Oct. 27, 2006 | Employment Order signed approving BNM. |
| Nov. 6, 2006 | BNM letter to Cadle confirming Cadle would pay BNM's fees and expenses in Veil-Piercing Action. (Never disclosed until 8/11/11.) |
| Apr. 18, 19 & 25, 2007 | Section 727 Discharge Trial. Cadle prevails. |
| Apr. 20, 2007 | BNM moves to withdraw as counsel to Chap. 7 Trustee. |
| May 15, 2007 | Hearing on BNM Motion to Withdraw. Court denied. |
| Nov. 15, 2007 | B. Ct. Opinion denying summary judgment in Veil-Piercing Action. |
| Jan. 7, 2008 | Trustee orally announces settlement of Veil-Piercing Action. |
| Feb. 18, 2008 | Cadle objects to settlement. |
| April 15, 2008 | Settlement hrg. (first revelation about Cadle paying some BNM invoices). Settlement approved. |
| May 2, 2008 | Cadle appeals order approving settlement to district court. |
| Feb. 12, 2009 | Cadle stops paying BNM invoice for BNM's time representing Trustee. |
| Mar. 26, 2009 | District court affirms bankruptcy court approval of Settlement. |
| June 8, 2009 | Cadle appeals to Fifth Circuit. |
| Jan. 11, 2010 | Fifth Circuit schedules oral arguments in appeal for Mar. 1, 2012. |
| Mar. 1, 2010 | Attorney BA leaves BNM and joins different law firm. |
| Mar. 2, 2010 | Fifth Circuit oral argument. |
| June 2, 2010 | Fifth Circuit reverses approval of settlement & remands. |
| Apr. 11, 2011 | Bankruptcy court approves sale of Veil-Piercing Claims to Cadle for $41,500 (after auction). Attorney BA appears seeking continuance of trial date in Veil-Piercing Action (no consultation with Chap. 7 Trustee). |
| April 26, 2011 | Cadle representative testifies it paid $92,000 in fees to BNM. |

For 28 months, Cadle paying BNM's fees for BNM representing Trustee without ever disclosing it to bankruptcy court.

For one year, Cadle paying both sides of litigation.

For almost 5 years, the bankruptcy court knows none of this (2006-2011)

**APPENDIX**